[No. 4633-4-II.   Division Two.   July 8, 1982.]

TOANDOS PENINSULA ASSOCIATION, ET AL, *Appellants,* v. JEFFERSON COUNTY, ET AL, *Respondents.*

*Philip Best,* for appellants.

*William E. Howard, Prosecuting Attorney, Peter Buck, Joel Gordon, Kenneth O. Eikenberry, Attorney General,* and *L. E. Dreisbach, Assistant,* for respondents.

PETRICH, J.—Toandos Peninsula Association and Lester

Lambert,[1] plaintiffs below, challenge the issuance of building permits by Jefferson County for the construction of various facilities incident to a private commercial overnight campground on 252 acres adjoining Hood Canal.[2] The Superior Court determined that the issuance of the permits was not arbitrary and capricious and was based on a full consideration of the facts necessary for a proper decision. In making this ruling the court below determined the following: the comprehensive plan which prohibited campground development was for policy guidance only and not a binding regulatory tool; the environmental impact statement (EIS) originally prepared for a more encompassing plan was adequate even though it was not modified to discuss the scaled–down proposal eventually submitted by the applicant, Pacific Rim Group, Inc.; the environmental impact statement was adequate even though it did not discuss the later enacted comprehensive plan, since the county officials dealing with issuance of the permit were admittedly aware of the later plan; and the Shoreline Management Act of 1971 did not apply because the structures within the shoreline[3] were valued at less than $1,000.

The primary issues presented for review are:

1. Does a comprehensive plan which excludes campground facilities, but which was not implemented by any zoning regulation or other land use restriction, preclude the issuance of a building permit for such a facility?

2. Does a binding site plan with numerous restrictions and conditions between the county and developer authorizing a campground facility on property yet unzoned but contrary to the comprehensive plan amount to illegal spot

---

[1]Both parties plaintiff are hereafter referred to as Toandos.

[2]In Superior Court plaintiffs challenged the preliminary approval of a sewer and water system by the Department of Social and Health Services. On appeal this challenge has been abandoned.

[3]The shoreline includes not only the water areas but also lands landward for 200 feet. RCW 90.58.030(2)(d), (e) and (f).

zoning?

3. Is a project for a commercial campground which straddles the shorelines and upland area exempt from the permit requirements of the shoreline management act because the fair market value or total cost of the physical structures on the shorelines is less than $1,000, even though the value or cost of the upland improvements exceed this amount and the shorelines are to be used by the campground members for recreational purposes?

4. Does a private commercial campground project which provides its members ready access to the tidelands and adjoining beaches for their personal recreation and enjoyment, including clam digging and oyster picking, amount to a development which materially interferes with normal public use of the water and shorelines of the state so as to require a permit under the shoreline management act?

In addition to the foregoing issues, Toandos contends the EIS was inadequate, and that contrary to the planning enabling act, the county planning commission did not review the contemplated vacation and relocation of a county road, prior to the issuance of permits.

We answer each of the first two issues in the negative and decline to resolve whether the shoreline management act applies. We also believe the EIS was adequate and that the planning commission's review of a contemplated road modification was not essential to the issuance of building permits. Accordingly, we affirm the issuance of the building permits but specifically withhold judgment as to whether or not the campground project as planned and ultimately developed is exempt from the shoreline management act.

Defendant Pacific Rim Group, Inc. (PRG), a Washington corporation, is a land management company which develops private membership campground facilities through Thousand Trails, Inc., a division of PRG. PRG proposes to develop a 252–site campground on 252 acres located on the southern tip of Toandos Peninsula on Hood Canal in Jefferson County. The project borders 1,000 feet of waterfront. Opposed to this project are the plaintiffs, Toandos Penin-

sula Association, a Washington nonprofit corporation whose membership is composed of a majority of residents of Toandos Peninsula, and Lester J. Lambert, a member of the Association and a resident of the area.

The local residents have successfully resisted previous attempts by others to develop the property. One such attempt was a recreational homesite development consisting of approximately 1,000 homesites; another was a proposed campground with about 1,200 sites. PRG acquired the property and in 1977 proposed for this site a 394–unit campground on 311 acres with recreational facilities including a boat launch and dock. In April of 1977, a final EIS was published by the county through its planning department. The Shoreline Advisory Committee recommended disapproval of the shoreline management permit since the project as then conceived was not consistent with the shoreline management act or the Jefferson County Shorelines Management Master Program. Apparently no further efforts were made to secure approval or review of the permit under the shoreline management act. In July 1977, although determining that the EIS was adequate, the Board of County Commissioners rejected the proposal because of noncompliance with the county campground ordinance. Later judicial review held the ordinance did not apply and PRG renewed its attempts for approval of a campground development although substantially reduced in size and type of facilities from the original plan.

Jefferson County operates under the Planning Enabling Act of the State of Washington (RCW 36.70). The county in 1971, pursuant to the act, adopted a comprehensive plan for the county. In November of 1977, which was after the EIS was published but before PRG applied for the building permits now challenged, the county amended the comprehensive plan by adopting as a supplement thereto the Coyle Area Community Development Plan. The Coyle plan was a specific plan for the Southern Toandos Peninsula and among other things provided that "[o]vernight recreational facilities such as campgrounds should not be developed on

the Southern Toandos Peninsula." However, no zoning laws or land use restrictions governing the use of the lands on Toandos Peninsula have ever been adopted by the county.

The permit process, now challenged, was long and involved. In May 1978, applications for four building permits and a septic system permit were filed with the county. The planning department put a "hold" on the permits until it was determined the project complied with the State Environmental Policy Act of 1971 (SEPA) (RCW 43.21C). It was also decided that a new EIS would not be prepared but the first EIS would be supplemented if necessary. The county commissioners determined they would play an active role in the permit process through consideration of the environmental problems and possible mitigation thereof, and by way of recommendation to the building department official whether the permits should issue. Negotiations then commenced between the county and PRG to develop a more environmentally sensitive proposal.

On June 1, 1978, representatives of PRG met with county staff members and exchanged lists of environmental problems and possible mitigating measures. These lists were compiled by listing all impacts mentioned in the EIS, the earlier hearing on the EIS and comment letters. Mitigation included both suggested operating conditions and modification of the site plan as reflected in an amended plan dated May 31, 1978. On June 7, 1978, the county staff and PRG again met to explore solutions. A further set of conditions and another modified site plan dated June 6, 1978, were produced at that time.

On June 19, 1978, the county commissioners met and considered the proposed mitigations. At this meeting, Toandos was allowed to comment on the conditions. Based on suggestions of other departments and of citizens who appeared at the June 19 meeting, the planning staff developed a revised set of conditions on June 30, 1978. Next, the county commissioners met with Toandos and its attorney to hear its concerns. At that time Toandos presented a 13–page memorandum setting forth its comments and sug-

gested condition changes. Based on these comments, the planning department then prepared a detailed analysis of the conditions and the concerns of Toandos. This was in the form of a 15–page memorandum to other county officials. On August 10, 1978, the planning department gathered all of the suggested conditions and comments to compile a list of 69 suggested conditions. Another amended site plan reflecting the changes in the project was prepared.

On August 14 and 15, the county commissioners again met and considered the PRG project. Toandos and PRG and their attorneys were given the opportunity to comment. At the August 15 meeting, the county commissioners recommended approval of the project. Counsel for Toandos was given another week to comment on the conditions, which it did by way of an 18–page document discussing the conditions and suggesting additional changes. Finally, on August 28, 1978, the county commissioners formally recommended approval of issuance of building permits for the project subject, however, to PRG's detailed site plan and a final total of 71 conditions governing construction and operation of the campground.[4] The permits were issued as recommended by the county commissioners.

We turn first to Toandos' challenges concerning the comprehensive plan. Toandos contends that the permits should have been denied because the comprehensive plan in one of its many policy statements provides "[o]vernight recreational facilities such as campgrounds should not be developed on the Southern Toandos Peninsula." We disagree.

■ The county operates under the Planning Enabling Act of the State of Washington, RCW 36.70. RCW 36.70-.320 directs the planning agency to prepare a comprehensive plan which on approval by the county commissioners becomes the "blueprint" for orderly development of the county. A comprehensive plan, without regulatory imple-

---

[4]Included as one of the conditions was the installation of five fire pits located within 200 feet of the high water mark. The fire pits were required in order to discourage uncontrolled beach fires.

mentation, does not impose restrictions upon property and does not deprive or limit the landowner of the use of property. *See Barrie v. Kitsap Cy.,* 93 Wn.2d 843, 853, 613 P.2d 1148 (1980); *Shelton v. Bellevue,* 73 Wn.2d 28, 35, 435 P.2d 949 (1968). The zoning ordinance is the primary regulatory device under the act. *Westside Hilltop Survival Comm. v. King Cy.,* 96 Wn.2d 171, 634 P.2d 862 (1981).

The court in *Barrie v. Kitsap Cy., supra* at 848, explained the limited purpose of the comprehensive plan in the following language:

> RCW 36.70.320 directs the county planning agency (commission) to prepare a comprehensive plan. That plan is defined as a source of reference and policy guide for official regulations and controls. RCW 36.70.020(6)(c) and (d). "Official controls," including zoning ordinances, are "the means of translating into regulations and ordinances . . . the general objectives of the comprehensive plan." RCW 36.70.020(11). RCW 36.70.340 states the comprehensive plan shall not "be considered to be other than . . . a guide to the later development and adoption of official controls."

The plan's limited purpose is specifically acknowledged in the Jefferson County Comprehensive Plan:

> [The Plan] will not generally regulate the kinds of uses to which people put their land. Nor will it have any influence on individual building permits or existing lots or tracts of land already subdivided. These can only be accomplished by means of other implementing tools or ordinances, some of which are briefly outlined in stage 2.

Jefferson County has not adopted any zoning ordinances. Since the comprehensive plan in the instant case has the effect of only suggesting regulatory measures and since the area of the campground site is unzoned and the plan was not otherwise implemented, we hold it was not error to issue the permits even though the project appeared to be in conflict with a policy statement contained in the plan.

Toandos urges that the binding site plan, covenants, and numerous conditions incorporated into the permit combined to create an "official control" as defined by RCW

36.70.020(11). It argues that the county, in entering into the binding site plan and imposing conditions, adopted official controls in conflict with the comprehensive plan which amounted to spot zoning, and was arbitrary and capricious.

"Official controls" is the vehicle by which the general objectives of the comprehensive plan are translated into regulations and ordinances. They are defined as: "legislatively defined and enacted policies, standards, precise detailed maps and other criteria" which control part or all of the county. RCW 36.70.020(11). Certain official controls referenced in RCW 36.70.560 must be adopted by ordinance. RCW 36.70.570, .660. A quite distinct concept is a site plan.

Pursuant to Jefferson County Ordinance 3–74 (whereby the county adopted the 1973 Uniform Building Code), a building permit applicant is required to include with his permit application plans and specifications which are to be drawn to scale and must indicate the nature and extent of the work proposed and show the project will conform to all relevant laws. These plans are to be approved by the building official, and may not be changed without authorization from the building official.

The county's authority to attach conditions to a building permit is not contested. Indeed, in 9 E. McQuillin, *Municipal Corporations* § 26.204, at 520 (3d ed. 1978), the author suggests that "reasonable conditions and requirements may be contained in, or attached to, a permit and compliance therewith after its issuance made essential to its continued force, effect and validity." *See, e.g., Mercer Enters., Inc. v. Bremerton,* 93 Wn.2d 624, 611 P.2d 1237 (1980). We do not find persuasive Toandos' argument that an approved site plan with conditions and covenants is an "official control" as used in the context of the planning enabling act, requiring approval by procedures contained in the act. The site plan is required by ordinance. It is not novel that a project is modified after the plans are submitted and the county and developer confer. *See, e.g., Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978). To

hold that the required site plan, when coupled with the parties' attempts to minimize environmental and other concerns through imposition of conditions, transforms the permit process into an official control requiring passage in accordance with the planning enabling act, extends the meaning of official controls beyond that contemplated in the planning enabling act.

We hold that agreeing on a binding site plan with covenants and conditions followed by the issuance of a building permit on property then free of zoning is not per se a zoning action, nor did the negotiation and imposition of conditions bring it closer to a zoning action or any other of the official controls as defined by the planning enabling act.

■ Having determined that the permit process does not amount to a zoning measure, it follows that the issuance of the permit cannot be characterized as "spot zoning." Spot zoning is

> arbitrary and unreasonable zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from and inconsistent with the classification of surrounding land, and not in accordance with the comprehensive plan. Spot zoning is a zoning for private gain designed to favor or benefit a particular individual or group and not the welfare of the community as a whole.

*Smith v. Skagit Cy.*, 75 Wn.2d 715, 743, 453 P.2d 832 (1969). The concept of spot zoning by its very definition contemplates zoning action. Even if we were to assume that somehow the issuance of the permit with attendant conditions and restrictions amounted to a zoning classification, it could not amount to spot zoning. The use to which the PRG property is placed by the permit process is not inconsistent with the classification of the surrounding area. There are no restrictions on the surrounding area; the entire area is unzoned. Furthermore, we fail to see how the imposition of numerous conditions somehow confers a private gain on PRG where none of the property owners in the surrounding area are restricted by any similar conditions.

Toandos next claims the EIS was inadequate because it did not discuss the application of the comprehensive plan, the shoreline management act, the Shorelines Management Master Program, and inadequately discussed alternatives to the proposed development.

■ The inadequacy of an EIS is a question of law. *Barrie v. Kitsap Cy., supra; Leschi Imp. Coun. v. State Hwy. Comm'n,* 84 Wn.2d 271, 286, 525 P.2d 774 (1974). Courts will review an EIS to determine whether the project's environmental effects are reasonably disclosed, discussed, and substantiated. *Cathcart–Maltby–Clearview Comm'ty Coun. v. Snohomish Cy.,* 96 Wn.2d 201, 634 P.2d 853 (1981). The EIS is not a compendium of every conceivable effect or alternative to a proposed project, but is simply an aid to the decisionmaking process. Here, the EIS makes no reference to the modified comprehensive plan which was adopted after the EIS was prepared. However, all parties concede that the fact of the change in the comprehensive plan and how it affected this project was known to the county officials involved. It is also apparent from the long history of the permit process that the decisionmaking official was well aware of the consistency or lack thereof of the project to the shoreline management act and Master Program. The EIS is not inadequate on this ground.

■ SEPA guidelines make it clear that it is not necessary in an EIS to explore every conceivable alternative to a proposed action. WAC 197–10–440(12). A rule of reason is implicit in this aspect of SEPA, as well. *See Leschi Imp. Coun. v. State Hwy. Comm'n, supra; Life of Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 40 L. Ed. 2d 312, 94 S. Ct. 1979 (1974). The discussion of alternatives in an EIS need not be exhaustive if the impact statement presents sufficient information for a reasoned choice of alternatives. *Mason Cy. Med. Ass'n v. Knebel,* 563 F.2d 256 (6th Cir. 1977); *accord, Life of Land v. Brinegar, supra* at 472.

This is a proposal for a private project on a specific site which does not involve a rezone or contract rezone. Discus-

sion of alternatives is limited to (1) no action, and (2) reasonable alternative means of achieving the objective of the proposal on the same site, or other sites owned or controlled by the proponent. WAC 197–10–440(12). Toandos complains the EIS does not discuss achieving the objective of the proposal on other sites owned by PRG. However, there was no showing that PRG owned any other sites in or near the Olympic Peninsula. It is PRG's goal to provide environmentally sound campsites to its members in various recreational areas. It is geared toward membership growth, while maintaining a reasonable campsite/member ratio. Applying the rule of reason, in view of PRG's goal, a discussion of development of its other properties in other recreational areas was not fatal.

Toandos' challenge to the issuance of the permit because the planning commission did not review the contemplated vacation and relocation of a county road as provided in the planning enabling act is also without merit. There is no requirement by state law or county ordinance that a planning commission review the permit issuing process. The permit process is the only matter now up for review. It is apparent that the road vacation is contemplated in the future. At such time as the road vacation is processed it will then be necessary to have the planning commission's report on how the vacation complies with the comprehensive plan. Since that has not yet occurred, there is nothing before us to decide in this regard.

Finally, we consider the challenge to the project for alleged noncompliance with the Shoreline Management Act of 1971, RCW 90.58. The county planning director was of the opinion that a permit under the shoreline management act was not required because the value of the proposed improvements (the fire pits) within 200 feet of the high water mark (wetlands) was less than $1,000. The county commissioners were obviously in agreement with this view.

Toandos, relying on the liberal construction of the shoreline management act mandated by the act itself, RCW

90.58.900, and by court decisions in *English Bay Enters., Ltd. v. Island Cy.,* 89 Wn.2d 16, 568 P.2d 783 (1977) and *Hama Hama Co. v. Shorelines Hearings Bd.,* 85 Wn.2d 441, 536 P.2d 157 (1975), contends that the value of all the improvements of an integrated project which partially intrudes onto the 200–foot strip of wetlands ought to be considered rather than only those within the wetlands, in determining whether a substantial permit is required. In light of this same policy, Toandos also contends that the hand digging of clams and picking of oysters on the scale envisioned by the EIS amounts to a "development which materially interferes with the normal public use of the water or shorelines of the state", RCW 90.58.030(3)(e), and is thus subject to the permit requirements of the act.

▮ Because of the nature of these proceedings and the state of the record, we are unwilling to rule on whether or not the shoreline management act applies. Although the issuance or denial of a substantial development permit by the local authority (in this case the county) may be subject to review by the Shorelines Hearings Board and eventually by the court, RCW 90.58.180, a determination by the local governing authority that a substantial development permit is unnecessary is not reviewable by the Shorelines Hearings Board. We are thus deprived of the expertise and experience of the board whose interpretations are entitled to great weight in interpreting the shoreline management act. *English Bay Enters., Ltd. v. Island Cy., supra; Hama Hama Co. v. Shorelines Hearings Bd., supra.* The permit process, however, is not the only means of insuring compliance with the mandates and policy of the act. The Attorney General and the prosecuting attorney of the county are specifically empowered and directed to initiate appropriate court actions to insure that "no uses are made of the shorelines of the state in conflict with the provisions and programs of this chapter, and to otherwise enforce the provisions of this chapter." RCW 90.58.210. In *Weyerhaeuser Co. v. King Cy.,* 91 Wn.2d 721, 592 P.2d 1108 (1979)

and in *Merkel v. Port of Brownsville,* 8 Wn. App. 844, 509 P.2d 390 (1973), the Attorney General and/or the prosecuting attorney appropriately raised the question of compliance with the act which was then resolved by the court. This is as it should be.

In the instant case there very well may be a serious question of whether the project complies with the shoreline management act. We do not have before us, however, the participation of those public officials who are the principal enforcement officers of the act. Furthermore, in this case we are simply reviewing the issuance of permits by the county building officer. The county commissioners were acting only in an advisory capacity insofar as the shoreline management act is concerned. The forum in the proceedings below was not adequate to develop and resolve critical factual issues. Some evidence was presented in the Superior Court below, but even so, Toandos was substantially restricted in what could be presented. We believe the question of compliance with the shoreline management act should be reserved to another day in proceedings initiated by the Attorney General and/or the prosecuting attorney for Jefferson County.

In the absence of zoning ordinances, a building permit should issue if the building plans and specifications are in compliance with the building code. *State ex rel. Klappsa v. Enumclaw,* 73 Wn.2d 451, 439 P.2d 246 (1968). The Jefferson County Building Code provides that a permit shall issue if the plans conform to the code and other pertinent laws. In view of our holding that SEPA has been complied with, that the planning enabling act has not been violated, and that the shoreline management act issue is not properly before us, we affirm the judgment below approving the issuance of the building permit. That portion of the judgment which rules on the application of the shoreline management act is reversed and modified in accordance with

this opinion.

REED, C.J., and MUNSON, J., concur.

Reconsideration denied August 23, 1982.