[No. 53841-7. En Banc. December 15, 1988.]

COUGAR MOUNTAIN ASSOCIATES, *Appellant,* v. KING COUNTY, *Respondent.*

*Hillis, Clark, Martin & Peterson, P.S.,* by *Richard R. Wilson* and *Glenn J. Amster,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Ann Schindler, Deputy,* for respondent.

*J. Richard Aramburu* on behalf of Washington Environmental Council; *Richard L. Andrews, City Attorney for the City of Bellevue,* and *Richard Gidley, Assistant,* amici curiae for respondent.

CALLOW, J.—Cougar Mountain Associates (Cougar Mountain) challenges King County's denial of its subdivision application. The County denied the application primarily because of the potential adverse environmental impacts that could result from the development of the proposed subdivision. We hold that the County erred in the procedure by which it denied Cougar Mountain's application. The County failed to set forth precisely the significant environmental impacts it considered in denying Cougar Mountain's application. Furthermore, the County failed to either describe mitigating measures available to Cougar Mountain or state that the potential environmental impacts could not be mitigated. We reverse the decision of the trial court upholding the County's denial of Cougar Mountain's subdivision application and remand the cause for further consideration.

In July 1982, Cougar Mountain filed an application in King County for preliminary plat approval of the proposed Ames Lake Hills Subdivision. An environmental checklist

accompanied the application. Cougar Mountain initially sought permission for the development of 101 single family residential lots on 135 acres located on a plateau above the Snoqualmie River Valley. The site was selectively logged in 1980 to 1981, and has not been reforested due to the likelihood of future conversion to urban development. Ames Creek crosses the southwest corner of the property, and the Ames Lake 57 Wetland is immediately adjacent to the northwest corner of the property. The subject property was included within the "Residential Reserve" area pursuant to the 1964 King County Comprehensive Plan. The recommended maximum density in such areas was one dwelling unit per 5 acres. In 1985, the County adopted a new comprehensive plan. Under the new plan, the subject property is classified as "Rural", but the recommended maximum density continues to be one dwelling unit per 5 acres. However, the zoning classification for the property is "G", which allows a maximum density of approximately one dwelling unit per acre. The land surrounding the proposed subdivision consists of agricultural and residential lots ranging in size from 5 to 10 acres.

After reviewing Cougar Mountain's application, the King County Building and Land Development Division (BALD) issued a Declaration of Significance pursuant to the State Environmental Policy Act of 1971 (SEPA), thus necessitating the preparation of an environmental impact statement (EIS) for the proposal. At the same time, the Subdivision Technical Committee, consisting of the head of the subdivision control section of BALD, a member of the Planning Division, and a member of the Department of Public Works recommended that Cougar Mountain's proposal be denied because of incompatibility of the proposed use with the surrounding area and the inability to conform the proposal to the King County Code requirements regarding availability of water. This recommendation was made pursuant to then–existing King County Code (KCC) 20.44.100(E), which stated:

When denial of a private proposal, which is determined to be significant, can be based on existing county ordinances, the responsible official may deny the request without preparing an EIS in order to save the applicant and the county from incurring needless expense . . . Provided, that the examiner may find that there is reasonable doubt that grounds for denial are sufficient, and therefore remand the application for consideration following preparation of an EIS . . .

Pursuant to the recommendation of the Subdivision Technical Committee, the Zoning and Subdivision Examiner held a hearing in October 1982. The Examiner concluded that there was a reasonable doubt that the plan should be denied outright, and remanded the application for reconsideration following preparation of an EIS. Cougar Mountain prepared a draft EIS, which the County issued in September 1985. The EIS analyzed the effects of the proposed subdivision on erosion, surface water, fish and wildlife habitat, land use, public services, and utilities. The draft EIS was then circulated to affected agencies, libraries, newspapers, and special interest groups. The County subsequently issued an EIS addendum to reflect the comments made by interested parties. By this time, the proposed subdivision consisted of 90 lots on 128 acres; an average density of .7 dwelling units per acre.

In May 1986, after reviewing the EIS, BALD issued a preliminary report on the proposed Ames Lake Hills Subdivision. BALD recommended that the plat be approved, subject to numerous conditions. The King County Zoning and Subdivision Examiner held a public hearing on the subdivision in June 1986. Following the hearing, the Examiner recommended denial of the plat, based on his conclusion that the proposal conflicted with the 1985 King County Comprehensive Plan, the zoning code, the Agricultural Preservation Program, and the purposes and policies of SEPA. However, the Examiner offered Cougar Mountain the option of amending its proposal to include 25 sites with a minimum lot size of 5 acres.

Cougar Mountain subsequently appealed the plat denial to the King County Council (Council). Following a hearing in October 1986, the Council passed ordinance 7811, denying the appeal. The ordinance adopted and incorporated the findings and conclusions made by the Zoning and Subdivision Examiner. However, the Council later determined that these findings and conclusions did not accurately reflect the Council's October decision. As a result, the Council drafted new findings and conclusions supporting its denial of Cougar Mountain's application. Copies of the revised findings and conclusions were sent to the parties of record. A revised ordinance adopting the new findings and conclusions was introduced in January 1987, and a hearing on the proposed ordinance was held in February. On February 2, 1987, the Council adopted ordinance 7945, which included the new findings and conclusions. The new ordinance reflected the Council's determination that Cougar Mountain's proposal should be denied because the subdivision would result in significant adverse environmental impacts that could not reasonably be mitigated. The Council also concluded that the proposal conflicted with several policies of the 1985 King County Comprehensive Plan.

In November 1986, Cougar Mountain sought review of the Council's denial of its subdivision application in King County Superior Court, pursuant to a writ of certiorari, writ of mandamus, and complaint for declaratory judgment. Cougar Mountain filed its complaint before the King County Council revised the ordinance denying Cougar Mountain's plat application. Cougar Mountain subsequently amended its complaint in light of the revised ordinance. After a hearing in March 1987, the trial court entered judgment in favor of King County. Cougar Mountain appealed the decision directly to this court, contending that this case raises "a fundamental and urgent issue of broad public import which requires prompt and ultimate determination." RAP 4.2(a)(4).

# I

Cougar Mountain contends that the County's denial of its subdivision application should be reviewed under the clearly erroneous test. The County asserts that the proper standard of review is the arbitrary and capricious test. In upholding the County's denial of Cougar Mountain's plat, the trial court apparently applied both standards of review, stating,

for purposes of clarity we do find that there was appropriate compliance with the statutory mandates so that we now as a review court are unable to say that the action of the Council was either arbitrary and capricious or that it was clearly erroneous.

Under the clearly erroneous standard of review, the court "does not substitute its judgment for that of the administrative body and may find the decision '"clearly erroneous"' only when it is '"left with the definite and firm conviction that a mistake has been committed."'" *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 69, 578 P.2d 1309 (1978) (quoting *Ancheta v. Daly,* 77 Wn.2d 255, 259–60, 461 P.2d 531 (1969)). *See also Norway Hill Preserv. & Protec. Ass'n v. King Cy. Coun.,* 87 Wn.2d 267, 552 P.2d 674 (1976). The court should "examine the entire record and all the evidence in light of the public policy contained in the legislation authorizing the decision." *Polygon,* at 69.

Cougar Mountain relies on *Polygon* to support its argument in favor of application of the clearly erroneous standard of review. In *Polygon,* a developer sought a building permit for construction of a 13–story condominium on Queen Anne Hill. After the developer submitted an environmental information worksheet, the Seattle Building Department determined that the proposal constituted a "major [action] significantly affecting the quality of the environment" under RCW 43.21C.030(2)(c), and that therefore an EIS would be required. *Polygon,* at 61. After the EIS was submitted, the superintendent of buildings

denied the developer's application pursuant to the standards set forth in SEPA. *Polygon,* at 61. The superintendent based the denial on his conclusion that the project was inconsistent with the aims of SEPA. He cited the visual impact of the building, the adverse effects on property values, and the trend toward more intense land use on Queen Anne Hill. *Polygon,* at 62. The developer appealed the superintendent's decision to the King County Superior Court, which granted summary judgment in favor of the City. The developer then sought direct review in this court.

*Polygon* recognized that "SEPA confers substantive authority to the deciding agency to act on the basis of the impacts disclosed [in the EIS]." *Polygon,* at 64. The court then determined the standard by which the superintendent's decision should be reviewed. It began by reviewing *Norway Hill Preserv. & Protec. Ass'n v. King Cy. Coun., supra,* in which the court applied the clearly erroneous standard of review to a negative threshold determination.[1] *Polygon* stated that the result in *Norway Hill* was based on the determination that "close review was necessary to ensure that the policies of SEPA were achieved." *Polygon,* at 68. The court stated additionally:

> We find it equally important that the same broad standard of review be available to a property owner whose property use has been limited by the denial of a building permit on the basis of SEPA.
> . . . This is particularly true in view of the fact that environmental factors, especially those involving visual considerations, are not readily subject to standardization or quantification. That potential for abuse is even stronger where the decision must be made in a climate of intense political pressures.

*Polygon,* at 68–69. The court concluded that

> this potential for abuse, together with a need to ensure that an appropriate balance between economic, social,

---

[1]A negative threshold determination is a decision by an agency that a particular project does not represent a "major [action] significantly affecting the quality of the environment." WAC 197–11–330. If a negative threshold determination is made, an EIS does not have to be prepared. WAC 197–11–330.

and environmental values is struck, requires a higher degree of judicial scrutiny than is normally appropriate for administrative action. Consequently, in order that there be a broad review, we apply the clearly erroneous standard to the superintendent's denial of Polygon's building permit.

*Polygon,* at 69.

The denial of the building permit in *Polygon* is analogous to the denial of Cougar Mountain's subdivision application in this case. As noted in *Polygon,* decisions based on environmental factors are not readily quantifiable, and often are made in an atmosphere of intense political pressure. SEPA should not be used to block construction of unpopular projects. *Parkridge v. Seattle,* 89 Wn.2d 454, 466, 573 P.2d 359 (1978). One commentator has set forth additional reasons why the clearly erroneous standard of review is appropriate for substantive decisions based on SEPA:

> First, in order to ensure that the policies promoted by SEPA are in fact incorporated into agency decisionmaking, it is necessary that the decisions be subject to critical review. Second, the major basis for judicial deference to administrative decisions—the expertise of the particular agency—does not apply when the agency is acting outside the area of that expertise, as is usually the case under SEPA. Third, the fundamental nature of the rights protected by SEPA makes a more intense standard of review appropriate. Finally, because the legislature has made it clear that the mandate announced by SEPA is statewide, broader review of administrative decisions is necessary to ensure that the statewide policy is not undermined by inappropriate political or economic pressures at the local level.

(Footnotes omitted.) Note, *A Standard for Judicial Review of Administrative Decisionmaking Under SEPA—Polygon Corp. v. City of Seattle, 90 Wn.2d 59, 578 P.2d 1309 (1978),* 54 Wash. L. Rev. 693, 699–700 (1979). For these reasons, application of the clearly erroneous standard of review is appropriate.

The County contends, however, that the arbitrary and capricious standard of review should be applied. Arbitrary and capricious conduct is defined as

> willful and unreasonable action, without consideration and [in] disregard of facts or circumstances. Where there is room for two opinions, action is not arbitrary and capricious when exercised honestly and upon due consideration though it may be felt that a different conclusion might have been reached.

*Barrie v. Kitsap Cy.,* 93 Wn.2d 843, 850, 613 P.2d 1148 (1980) (quoting *Buell v. Bremerton,* 80 Wn.2d 518, 526, 495 P.2d 1358 (1972)). As noted in *Polygon,* the clearly erroneous standard of review is broader than under the arbitrary and capricious test and avoids placing the responsibility for an ultimate decision within the sole subjective discretion of the administrative or legislative body. *Polygon,* at 67.

The County cites *Nagatani Bros. v. Skagit Cy. Bd. of Comm'rs,* 108 Wn.2d 477, 739 P.2d 696 (1987) in support of its argument that the arbitrary and capricious standard of review should be applied. In *Nagatani,* the County denied approval of a preliminary plat for the development of 29 residential lots. The denial was based in part on potential adverse environmental impacts. This court concluded that "[b]ased on this record, denial on that basis was an *arbitrary and capricious decision.*" (Italics ours.) *Nagatani,* at 482. However, this decision does not represent a purposeful determination by the court to apply a narrower standard of review in such cases. The parties in that case did not challenge the application of the arbitrary and capricious test. In addition, the court held that the County could not satisfy even the more relaxed arbitrary and capricious standard of review. The clearly erroneous standard of review used in *Polygon* should also be applied in this case.

## II

In 1971, the Washington Legislature passed the state environmental policy act. The purposes of SEPA are:

> (1) To declare a state policy which will encourage productive and enjoyable harmony between man and his

environment; (2) to promote efforts which will prevent or eliminate damage to the environment and biosphere; (3) and stimulate the health and welfare of man; and (4) to enrich the understanding of the ecological systems and natural resources important to the state and nation. RCW 43.21C.010.[2] SEPA's primary enforcement tool has been the EIS. An EIS must be prepared on proposals that will have a probable significant adverse environmental impact. RCW 43.21C.031. "'Significant' as used in SEPA means a reasonable likelihood of more than a moderate adverse impact on environmental quality." WAC 197–11–794(1). In the past we have found significant impacts in cases wherein there was major opposition to a project, a primary change of direction in the use or activity on a large area, a meaningful threat posed to flora or fauna, or the perceived beginning of accelerating development. *Noel v. Cole,* 98 Wn.2d 375, 655 P.2d 245 (1982); *Asarco Inc. v. Air Quality Coalition,* 92 Wn.2d 685, 601 P.2d 501 (1979); *Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980); *Polygon Corp. v. Seattle, supra; Sisley v. San Juan Cy.,* 89 Wn.2d 78, 569 P.2d 712 (1977); *Leonard v. Bothell,* 87 Wn.2d 847, 557 P.2d 1306 (1976); *Swift v. Island Cy.,* 87 Wn.2d 348, 552 P.2d 175 (1976); *Norway Hill Preserv. & Protec. Ass'n v. King Cy. Coun., supra; Narrowsview Preserv. Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974); *Toandos Peninsula Ass'n v. Jefferson Cy.,* 32 Wn. App. 473, 648 P.2d 448 (1982). It is important impacts such as these upon an area that are classified as "significant" and while they require the preparation of an EIS, they also require the full panoply of procedural protection. *See also* Rogers, *The Washington Environmental Policy Act,* 60 Wash. L. Rev. 33 (1984).

The Washington courts have recognized that the SEPA legislation has bestowed broad and far reaching powers. We

---

[2]"SEPA is essentially a procedural statute to ensure that environmental impacts and alternatives are properly considered by the decision makers." *Save Our Rural Env't v. Snohomish Cy.,* 99 Wn.2d 363, 371, 662 P.2d 816 (1983).

have recognized that SEPA confers substantive authority on agencies to act on the basis of impacts disclosed in an EIS. *See Polygon,* at 64; *Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 663, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980). However, before an agency can condition or deny a proposal based on SEPA, it must comply with certain statutory and regulatory requirements. Cougar Mountain contends that the King County Council failed to comply with these requirements when it denied Cougar Mountain's subdivision application. We agree, and reverse the trial court's decision upholding the Council's denial of Cougar Mountain's application.

RCW 43.21C.060 provides that any governmental action may be conditioned or denied pursuant to SEPA. *See also Polygon,* at 64. Any denial must be based "upon policies identified by the appropriate governmental authority and incorporated into regulations, plans, or codes which are formally designated by the agency". RCW 43.21C.060; WAC 197–11–660(1)(a). King County Code (KCC) 20.44-.080(B) sets forth policies, plans, rules, and regulations that may serve as potential bases for the exercise of the County's authority under SEPA. The potential bases for county action include, *inter alia,* SEPA, the King County Comprehensive Plan, and the King County Zoning Code. KCC 20.44.080(B). Additionally, in order to deny a proposal on SEPA grounds, an agency must find that:

> (1) The proposal would result in significant adverse impacts identified in a final or supplemental environmental impact statement prepared under this chapter; and (2) reasonable mitigation measures are insufficient to mitigate the identified impact.

RCW 43.21C.060; WAC 197–11–660(1)(f). WAC 197–11–660(1)(b) adds that "The decision maker shall cite the agency SEPA policy that is the basis of any condition or denial under this chapter".

In this case, the King County Council apparently based its denial of Cougar Mountain's application on conflicts with SEPA and the 1985 King County Comprehensive

Plan. However, the Council failed to describe the specific SEPA policies with which Cougar Mountain's application conflicted. The Council merely stated that "the proposal as presently envisioned would likely result in significant adverse environmental impacts which cannot be mitigated by reasonable mitigation measures."

In ordinance 7945 denying Cougar Mountain's application, the County Council concluded that:

1. As presently envisioned, the proposal would be likely to result in significant adverse environmental impacts on water quality and wildlife habitat, specifically Ames Lake Wetlands Nos. 57 and 58 and Ames Creek, assorted public services including schools, fire protection and solid waste disposal, and land use by heightening the trend toward more intense land use in the area and creating pressure to alter surrounding land use, both in and of itself, and considered as part of the cumulative impact with other similar developments.

2. Reasonable mitigation measures are insufficient to mitigate these identified adverse environmental impacts in that the evidence established that native growth protection easements would not effectively protect the impacted creeks and wetlands, and that the pressures on existing public services and heightened trend towards more intensive land use unavoidably follow from the introduction of 90 homes housing in excess of 300 individuals in a predominantly rural area.

These conclusions are not sufficiently specific to comply with the requirements of RCW 43.21C.060 and WAC 197–11–660 regarding denials of proposals on SEPA grounds. The Council merely stated in a conclusory fashion that the proposal would result in significant environmental impacts and that these impacts could not reasonably be mitigated. Much the same could be said for the settlement of the cities and towns of the state during the last century. The purpose of SEPA is to control the expansion of our population upon the land in such a way as to harmonize the interaction between humans and the environment and to protect nature. SEPA seeks to achieve balance, restraint and control rather than to preclude all development whatsoever. Its

scheme cuts both ways as an instrument of control placed in the hands of government, but not an unbridled control that can ignore due process and fair treatment of landowners. Although the Council did set forth significant adverse impacts that would result from development of Cougar Mountain's proposed subdivision, it failed to state why the mitigation measures included in the EIS were insufficient to offset these impacts.[3]

The Council began by concluding that Cougar Mountain's proposal would be likely to result in significant adverse environmental impacts on water quality and wildlife habitat. The Council noted that one suggested mitigation measure, native growth protection easements, would be difficult to enforce. However, the Council failed to discuss the numerous other mitigation measures recommended in the EIS. Thus, it is unclear whether the Council's decision is based solely on the potential difficulty in enforcing native growth protection easements, or whether the Council also determined that the other recommended mitigation measures were insufficient to protect water quality and wildlife habitats.

The Council then noted that Cougar Mountain's proposal would be likely to result in significant adverse impacts on public services in the area of the proposed development, including schools, fire protection, and solid waste disposal. Again, the Council did not specifically state why reasonable mitigation measures would be insufficient to alleviate the impact of the proposed development.

---

[3]The observation of *Sisley v. San Juan Cy.,* 89 Wn.2d 78, 85, 569 P.2d 712 (1977) indicating the need for specificity is apropos:

> [T]he record of a negative threshold determination by a governmental agency must "demonstrate that environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA." *Juanita Bay Valley Community Ass'n v. Kirkland,* [9 Wn. App. 59, 73, 510 P.2d 1140 (1973)].

The opinion continues with a criticism of the record made by the governmental authority stating: "Unfortunately the Board's conclusion . . . is accompanied by no reasoning, explanation or findings of fact, however informal." *Sisley,* at 85–86.

Finally, the Council pointed to the adverse impacts on land use that would result from Cougar Mountain's proposal. The Council stated the obvious—that the addition of 90 new homes to the area would result in an impact on the existing area land use. However, the only concern raised by the Council involved the potential conflict between traffic to the development and slow–moving agricultural traffic currently using the roads near the site of the proposed development. The Council cannot merely state that a proposed development will have an impact on existing land use in an area. If this were the case, no development could occur in rural areas. The Council cannot use SEPA as an excuse for the denial of proposals. If proposals are rejected on the basis of SEPA concerns, the agency must spell out its objections and how they can be satisfied or, if not, why not. Thus, before denying a proposal on SEPA grounds, we hold that an agency must (1) specifically set forth potential adverse environmental impacts that would result from implementation of the proposal, and (2) specifically set forth reasonable mitigation measures to counteract these impacts, or, if such measures do not exist, (3) specifically state why the impacts are unavoidable and development should not be allowed. The King County Council did not follow this procedure.

## III

Cougar Mountain also asserts that the Council erred when it used the King County Comprehensive Plan as a means for denying Cougar Mountain's subdivision application. Cougar Mountain contends that because its application complied with applicable zoning requirements, the fact that the application fails to comply with the provisions of the Comprehensive Plan is irrelevant.

RCW 36.70, the county planning enabling act, defines a comprehensive plan as:

[T]he policies and proposals approved and recommended by the planning agency or initiated by the board and approved by motion by the board (a) as a beginning step

in planning for the physical development of the county; (b) as the means for coordinating county programs and services; (c) as a source of reference to aid in developing, correlating, and coordinating official regulations and controls; and (d) as a means for promoting the general welfare. Such plan . . . shall serve as a policy guide for the subsequent public and private development and official controls so as to present all proposed developments in a balanced and orderly relationship to existing physical features and governmental functions.

RCW 36.70.020(6). Thus, the comprehensive plan provides an overall guide for development. Zoning regulations, on the other hand, set forth specific requirements for land use in a particular area. "The heart of a typical zoning ordinance defines the various districts and the regulations of use, lot size, site coverage, density, height, landscaping, parking, signs and other matters." R. Settle, *Washington Land Use and Environmental Law and Practice* § 2.3(a) (1983).

In this case, the density requirements of the King County Comprehensive Plan are in conflict with those set forth in the King County Zoning Code. Cougar Mountain asserts that the provisions of the zoning code should control, while the Council relied on the provisions of the Comprehensive Plan to deny Cougar Mountain's proposal. In ordinance 7945, the Council concluded that "the proposal as presently envisioned also conflicts with numerous policies of the King County Comprehensive Plan." The policies cited by the Council included those describing recommended uses for areas classified as "Rural". The subject property is classified as a Rural area under the Plan, with a recommended maximum density of one dwelling unit per 5 acres. However, under the King County Zoning Code, the property is classified as "G", with a recommended density of one dwelling unit per acre. Cougar Mountain contends that the recommended density provisions of the zoning code should prevail over those described in the Comprehensive Plan. Cougar Mountain argues that its subdivision application

should have been approved, since it complied with the recommended density requirements set forth in the zoning code.

In *Nagatani Bros. v. Skagit Cy. Bd. of Comm'rs,* 108 Wn.2d 477, 739 P.2d 696 (1987), the Skagit County Planning Commission denied the developer's proposed plat in part because of the proposal's failure to comply with the policies of the Skagit County Comprehensive Plan. *Nagatani,* at 479. The plat did comply with applicable zoning requirements, however. We stated that an "inconsistency between the zoning ordinance and the comprehensive plan must be resolved by application of the zoning ordinance." *Nagatani,* at 480 (citing *Norco Constr., Inc. v. King Cy.,* 97 Wn.2d 680, 649 P.2d 103 (1982)); *Carlson v. Beaux Arts Village,* 41 Wn. App. 402, 408, 704 P.2d 663, *review denied,* 104 Wn.2d 1020 (1985). "[A] comprehensive plan is no more than a general policy guide to the later adoption of official controls which is subordinate to specific zoning regulations." *Carlson,* at 408. Cougar Mountain's application complied with applicable zoning requirements, although it conflicted with the guidelines set forth in the King County Comprehensive Plan. Thus, the County erred in relying on the provisions of the King County Comprehensive Plan to deny Cougar Mountain's application. The application complied with the relevant zoning requirements and should not have been denied on the basis of density guides in the Comprehensive Plan.

## IV

In order for an agency to deny a proposal based on SEPA grounds, the agency must conclude that the proposal would result in significant adverse environmental impacts and that reasonable mitigation measures are insufficient to mitigate these impacts. Further, the agency must specifically describe the adverse environmental impacts, and either outline mitigation measures or specifically state why such measures are insufficient. Once the agency complies with these requirements, its decision will be reviewed on appeal

under the clearly erroneous standard, and the court will not overturn the agency's decision unless "left with the definite and firm conviction that a mistake has been committed." The King County Council did not comply with the requirements necessary for a SEPA denial. We remand the cause to the Superior Court with instructions that it enter an order referring the matter to the King County Council for reconsideration of the proposal of Cougar Mountain Associates.

UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, and DURHAM, JJ., concur.

DORE, J. (dissenting)—I dissent. King County did comply with the requisite statutory and regulatory requirements and, it did not err in relying on the provisions of the King County Comprehensive Plan in denying Cougar Mountain's subdivision application.

I would affirm the trial court.

### FACTS

This case is about the approval of a subdivision of a 128–acre undeveloped parcel of land into 90 building lots for new residences. The proposed site for this subdivision is adjacent to Ames Lake Wetland 57 which is rated as a unique and outstanding wetland. The water flowing into this wetland flows into a nearby wetland, Ames Lake Wetland 58. A wetland is a swamp, marsh or bog that supports vegetation typically adapted for life in saturated soil condition. The site itself contains several small knolls, ravines and depressions throughout. These ravines and depressions form the headwater extensions of tributaries that flow primarily into the wetlands. The majority of the eastern half of the site is an erosion hazard area. Terrain on the site varies from relatively level to steep slopes.

Cougar Mountain Associates filed an application for approval of this subdivision. An environmental impact statement was required because the proposal would have

significant adverse environmental impacts. After the environmental information was reviewed, the King County Council, in ordinance 7945 (February 2, 1987), denied the proposal pursuant to its authority under SEPA.

### STATUTORY REQUIREMENTS

In order to deny a proposal under SEPA, "an agency must *find* that: (1) The proposal would result in significant adverse impacts *identified in a final or supplemental environmental impact statement* prepared under this chapter; and (2) reasonable mitigation measures are insufficient to mitigate the identified impact." (Italics mine.) RCW 43.21C.060. King County followed this mandate when it adopted and incorporated findings, conclusions and decision in ordinance 7945 denying Cougar Mountain's proposal. While the conclusions may not be "sufficiently specific", as the majority holds, the incorporated findings of ordinance 7945 are sufficiently specific to comply with the statutory requirements. These findings are discussed below.

The EIS and finding 5 detailed the unavoidable adverse impacts of the project and identified surface water runoff, erosion, public services, water quality, wildlife and impacts on existing land use as major issues.

Finding 7 discussed the impacts on the wetlands and Ames Creek as follows:

A . . . Development in the density proposed [by the subdivision] can be expected to significantly disturb Wetland 57 with an adverse impact on this unique and outstanding wetland. The impact on this wetland can be expected to be particularly adverse during March through June which is the breeding season for both migratory fowl and resident wildlife species.

B. Flowing out of Ames Lake Wetland No. 57 is Ames Creek which is rated by the Department of Natural Resources as a Type 3 water. [This classification] is applied to natural waters which among other things are used by significant numbers of fish for spawning, rearing and migration, are used by significant numbers of resident, game fish, or are highly significant for the protection of downstream water quality.

The recommended mitigation measures for both the wetlands and the creek were detention/retention ponds and native growth protection easements. The King County Council found this mitigating measure to be insufficient in finding 7:

A . . . Although the proposal contemplates mitigation of any impacts on the wetlands by the provision of a native growth easement between the wetland and any development, such native growth protection easements are difficult to enforce and therefore risk losing their integrity. . . .

B . . . As with the mitigation for Ames Lake Westland [*sic*] No. 57, a native growth protection easement is proposed to mitigate the adverse impacts of the development on Ames Creek.

The EIS and finding 6 identified the significant impacts on public services: The proposal would create a need to upgrade the fire station in Carnation. It would also require the addition of one more police officer to the area precinct. The solid waste disposal transfer station is currently operating at capacity and the new site for a use facility has not been determined. The junior and senior high schools would be placed above their planned capacity and could have adverse effects on the ability of the school district to staff and provide educational services, particularly due to current state funding levels and the lag time of the new homes being placed on the tax rolls.

The Council in its findings was concerned with the funding for these needed public services. The Council's concern was well grounded, given the recent political climate in rural areas against the passage of new bond issues. The Council found that the proposal adversely impacted public services in the area. The measures to deal with the cost of these services were insufficient to mitigate the impacts discussed.

In finding 8, the Council also considered the pressure to alter surrounding land use. A proposed project's potential for creating pressure to alter surrounding land use may properly be evaluated in a decision of this nature. *Polygon*

*Corp. v. Seattle,* 90 Wn.2d 59, 70, 578 P.2d 1309 (1978).
Specifically, the Council found an

> unavoidable adverse impact of the proposal through the
> creation of pressure for similar density developments in
> the area through the introduction of . . . an estimated
> 307 people . . . and the concomitant expansion and
> extension of services into previously undeveloped areas
> for purposes of providing service to the proposal.

The Council considered this and found the resulting pressures unavoidable.

The King County Council's incorporated findings of
ordinance 7945 identified the significant adverse impacts,
the insufficient mitigation measures suggested, and the
Council's conclusion was that based on SEPA this subdivision as currently presented should be denied. King County
Ordinance 7945 was "sufficiently specific" to comply with
the statutory requirements.

### Use of Comprehensive Plan

In the subject case, the majority holds that the zoning
code repeals and/or supersedes SEPA if the comprehensive
plan is not in accordance with the zoning code. The majority, without reasoning or authority, unilaterally gives legislative bodies of municipal corporations veto powers over
SEPA. By doing this the majority overrules all those cases
which hold that SEPA "overlays local ordinances and must
be enforced even where a particular use is allowed by local
law or policy." These cases are *Cook v. Clallam Cy.,* 27 Wn.
App. 410, 415, 618 P.2d 1030 (1980), *review denied,* 96
Wn.2d 1008 (1981); *West Main Assocs. v. Bellevue,* 106
Wn.2d 47, 53, 720 P.2d 782 (1986); *Polygon Corp. v.
Seattle,* 90 Wn.2d 59, 65, 578 P.2d 1309 (1978).

The majority relies on *Nagatani Bros., Inc. v. Skagit Cy.
Bd. of Comm'rs,* 108 Wn.2d 477, 480, 739 P.2d 696 (1987),
(citing *Norco Constr., Inc. v. King Cy.,* 97 Wn.2d 680, 649
P.2d 103 (1982)) for its proposition that an "'inconsistency
between the zoning ordinance and the comprehensive plan
must be resolved by application of the zoning ordinance.'"
These cases relied on by the majority did not involve the

use of standards in a comprehensive plan where the plan standards have been specifically adopted as a basis for making local SEPA decisions. In view of this, the majority's reliance on *Nagatani* is misplaced.

The majority's position that a plan should be approved since it is in compliance with the zoning code misconstrues the nature of the SEPA mandate for environmental considerations. *Department of Natural Resources v. Thurston Cy.*, 92 Wn.2d 656, 665, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980).

An environmental review process reveals impacts that general zoning regulations do not and could not take into account. An example of such impacts would be the discovery of wetlands, steep slopes, or unstable soils on a particular piece of property. Thus, a proposal that is in compliance with a zoning regulation may nonetheless have environmental impacts, and under SEPA this proposal may be denied. *Polygon,* at 66; *West Main Assocs. v. Bellevue,* 49 Wn. App. 513, 525, 742 P.2d 1266 (1987); *Cook v. Clallam Cy.,* at 415; *see Department of Natural Resources,* at 667.

It is important to note that SEPA policies have regulatory effect only when a proposed project has been determined to significantly affect the environment. *West Main Assocs.,* at 525. When SEPA is not involved the question of whether a specific zoning ordinance prevails over a general comprehensive plan becomes a different situation from the present case.

Here, SEPA is involved in Cougar Mountain's proposed subdivision since it is a "major action significantly affecting the quality of the environment." The King County Council has enacted a SEPA ordinance which expressly adopts the comprehensive plan as a local SEPA policy. The King County Council, in addition to adverse environmental impacts, specifically based its denial of the Cougar Mountain proposal on policies and plans identified in this ordinance. In finding 10, the substantive basis for the County to deny the proposal of Ames Lake Hills was set forth:

10. In 1984, . . . King County identified in King County Code 20.44.080 both the policies of the state environmental policy act and the King County Comprehensive Plan as policies . . . which, among others, form the basis for the exercise of the county's substantive authority under Chapter 43.21C RCW.

The decision itself in ordinance 7945 states the basis for denial:

The proposal as presently envisioned would likely result in significant adverse environmental impacts which cannot be mitigated by reasonable mitigation measures. The proposal also conflicts with numerous policies of the King County Comprehensive Plan–1985. Therefore, pursuant to the authority provided by Chapter 43.21C RCW and King County Code Chapter 20.44, the proposal is denied with leave to submit a revised application.

Since the Council adopted the comprehensive plan as a local SEPA policy, it was entitled to rely on the comprehensive plan in denying the proposal under SEPA. *West Main Assocs.*, at 522.

## CONCLUSION

In sum, the Council complied with applicable statutory requirements in setting forth the basis for its decision, and this decision is supported by information set forth in the EIS and the adopted SEPA policies. Furthermore, the County did not err in relying on the comprehensive plan in denying the application. The record does not substantiate the majority's position that the court is "left with the definite and firm conviction that a mistake has been committed" by the Council. The Council's decision to deny Cougar Mountain's application passes the clearly erroneous test. I would affirm.

PEARSON, C.J., concurs with DORE, J.