[No. 19735-5-I. Division One. September 28, 1987.]

WEST MAIN ASSOCIATES, ET AL, *Appellants,* v. THE CITY OF BELLEVUE, ET AL, *Respondents.*

514

*G. Richard Hill, John McCullough,* and *Foster, Pepper & Riviera,* for appellants.

*Richard L. Andrews, City Attorney,* and *Richard Gidley, Assistant; Richard Settle* and *Roberts & Shefelman,* for respondent Bellevue.

*J. Richard Aramburu* and *Jeffrey Eustis,* for respondent Three Tower Legal Fund Committee.

WILLIAMS, J.*—Both sides in this litigation appeal from a judgment overturning the Bellevue City Council's denial of appellant West Main Associates' application for design approval of a large residential, retail, and office complex in the city of Bellevue. We reverse in part, and affirm in part.

## FACTS

In August 1983, appellant West Main submitted plans for its proposed project, Meydenbauer Place, to the City of Bellevue for design review approval. Meydenbauer Place is a 22–story mixed–use retail, office, and residential structure proposed for construction on a 1.1 acre tract in "Old Bellevue" at the southeastern edge of Bellevue's central business district. After reviewing the project, the city planning director approved the project with numerous conditions.

The Three Tower Legal Fund Committee, an association of persons and community organizations opposed to Meydenbauer Place, appealed the planning director's decision to the Bellevue City Council. The hearing examiner concluded that the planning director had clearly erred by approving West Main's plans and recommended that Three Tower's appeal be granted.

When the matter came before the Bellevue City Council,

---

*This appeal was heard by a Supreme Court Justice, a retired Supreme Court Justice, and a Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

several council members were challenged for bias. One council member, Mr. Keeffe, was challenged, in part, because he allegedly attended a Three Tower meeting about 2 weeks prior to the planning director's decision. In response to questions from West Main's attorney, Mr. Keeffe stated that he had made an appointment to meet someone where the Three Tower meeting had taken place. He stated that he arrived near the end of the meeting during a question and answer session, but did not hear any of the presentations made at the meeting and did not pay attention to what was going on. Though he spoke with some people at the back of the room, he did not discuss the subject of the meeting. On the advice of the city attorney, Mr. Keeffe remained on the council.

The city council, on a vote of 4 to 1, upheld Three Tower's appeal and denied West Main's design review application without prejudice to submission of a redesigned proposal. The council based its decision on two broad, independent grounds. First, it concluded that Meydenbauer Place, as proposed, failed to meet certain review criteria under Bellevue Land Use Code (LUC) 20.30.475. The council concluded that the project was not in accord with the goals and policies of the comprehensive plan, that the effect of the project on the immediate vicinity and the community as a whole would be materially detrimental, that the project, considered as a whole and as located, lacked merit and value for the community, and that, given its location, no reasonable measures existed to mitigate the project's significant adverse impacts.

Second, the council exercised its authority under the State Environmental Policy Act of 1971 (SEPA), and rejected the project on the basis of significant adverse environmental impacts which could not reasonably be mitigated, and which were unacceptable under Bellevue's locally adopted SEPA policies. The adverse impacts identified by the council included obstruction of scenic views, excessive bulk and scale compared to the surrounding area, increases in traffic and attendant air pollution, and shadow

effects.

West Main subsequently petitioned the superior court for, and was granted, a writ of review of the city council's decision. Following a review hearing, the court declared the council's decision void to the extent that it was based on the review criteria in LUC 20.30.475. Though the court concluded that the review criteria are invalid, it nevertheless upheld the council's decision to the extent that it was based on SEPA. However, the court ultimately set aside the council's decision and remanded the matter to the council on the ground that council member Keeffe had violated the appearance of fairness doctrine.

West Main now appeals from the court's conclusion that the council properly exercised its SEPA authority. Bellevue and Three Tower cross–appeal from the court's decision invalidating the review criteria and the decision regarding the appearance of fairness doctrine.

### SEPA APPEAL PERIOD

West Main first contends the city council lacked jurisdiction to consider SEPA issues because Three Tower did not file a SEPA appeal within the 10–day limitation period of Bellevue's SEPA ordinance, Bellevue City Code (BCC) 20.02.150. On the other hand, respondents contend (1) the appeal period is irrelevant because the council has substantive SEPA authority; (2) even if relevant, the appeal period is inapplicable here; and (3) even if applicable, the appeal period would be grossly inequitable.

The Bellevue Land Use Code provides that design review decisions by the planning director must be appealed to the city council within 20 days. LUC 20.30.475(E)(1). Though Three Tower complied with this appeal provision, it did not file a separate appeal, pursuant to BCC 22.02.150, within 10 days. West Main argues that Three Tower's failure to file a separate SEPA appeal within 10 days precludes any consideration or use of SEPA in subsequent proceedings. We disagree.

West Main's position on this issue contravenes SEPA. A

"major purpose" of SEPA is to "combine environmental considerations with public decisions". RCW 43.21C.075(1). Consistent with this purpose, "SEPA *mandates* governmental bodies to consider the total environmental and ecological factors to the fullest in deciding major matters." *Eastlake Comm'ty Coun. v. Roanoke Assocs.*, 82 Wn.2d 475, 490, 513 P.2d 36, 76 A.L.R.3d 360 (1973). These considerations must be integrated into governmental decisionmaking processes so that "presently unquantified environmental amenities and values will be given appropriate consideration in decision making along with economic and technical consideration". RCW 43.21C.030(2)(b); *Eastlake Comm'ty Coun.*, at 492. The environmental impact statement (EIS) must "accompany the proposal through the existing agency review processes" so that officials will use it in making decisions, RCW 43.21C.030(2)(d), WAC 197–11–655, and "[a]ny governmental action may be conditioned or denied" on the basis of adverse impacts disclosed by SEPA's environmental review process. RCW 43.21C.060; WAC 197–11–660; BCC 22.02.605(B); *Polygon Corp. v. Seattle*, 90 Wn.2d 59, 65, 578 P.2d 1309 (1978).

██ Thus, under SEPA, the council *must* consider environmental impacts in ruling on such applications. Since Three Tower timely appealed the planning director's design review decision and asserted, in part, that Meydenbauer Place would have several unmitigable adverse environmental impacts, the council had substantive authority under SEPA to consider these impacts even though Three Tower failed to file a separate SEPA appeal within 10 days of the planning director's decision. Furthermore, Bellevue's 10-day appeal procedure is inapplicable under RCW 43.21C-.075(3)(b). That statute states in pertinent part:

(3) If an agency has a procedure for appeals of agency environmental determinations made under this chapter, such procedure:

. . .

(b) Shall consolidate appeal of procedural issues and of substantive determinations made under this chapter

(such as a decision to require particular mitigation measures or to deny a proposal) *by providing for simultaneous appeal of an agency decision on a proposal and any environmental determinations made under this chapter,* with the exception of the threshold determination appeal as provided in (a) of this subsection or an appeal to the local legislative authority under RCW 43.21C.060 or other applicable state statutes;

(Italics ours.)[1] *See also* WAC 197–11–680(3)(a)(v). This statute requires consolidation of local appeal procedures for the underlying government action and SEPA determinations made in such action. Since Bellevue's appeal period for SEPA determinations is shorter than its appeal period for the underlying action, the SEPA appeal period is inapplicable in this case under RCW 43.21C.075(3)(b) and WAC 197–11–680(3)(a)(v). Therefore, the trial court correctly concluded that Three Tower's failure to file a separate SEPA appeal did not preclude it from raising SEPA issues in the council proceedings.

SEPA STANDARD OF REVIEW

West Main next contends this court must apply the clearly erroneous standard of review directly to the planning director's decision. On the other hand, respondents argue that the standard of review must be applied to the city council's decision.

In *Polygon Corp.,* our State Supreme Court held that appellate review of a city's denial of a building permit on SEPA grounds is governed by the "clearly erroneous" test. *Polygon,* at 68–69. In so holding, the court stated that in reviewing SEPA decisions, the appellate court

examine[s] the entire record and all the evidence in light of the public policy contained in the legislation authorizing the decision. *Ancheta v. Daly,* 77 Wn.2d 255, 461 P.2d 531 (1969). The court does not substitute its judgment for that of the administrative body and may find the decision "'clearly erroneous'" only when it is "'left

---

[1]We note that the word "agency" in RCW 43.21C.075 refers to any state or local unit of government. RCW 43.21C.075(8).

with the definite and firm conviction that a mistake has been committed.'" *Ancheta,* at 259–60.

*Polygon,* at 69. Thus, under *Polygon,* this court cannot, as West Main suggests, substitute its judgment for that of the administrative body, *i.e.,* the city council. It must be remembered that SEPA grants substantive authority to all government decision makers, including the city council. *Polygon,* at 64. Were we to apply the standard of review to the planning director's decision, we would be guilty of substituting our judgment for the substantive SEPA decision of the city council.

### APPLICATION OF SEPA

In order to deny a proposal under SEPA, a government body must find that (1) the proposal would likely result in significant adverse environmental impacts identified in a final environmental impact statement (FEIS), and (2) reasonable mitigation measures are insufficient to mitigate the identified impacts. WAC 197–11–660; RCW 43.21C.060. Furthermore, a denial must be

> based upon policies identified by the appropriate governmental authority and incorporated into regulations, plans, or codes which are formally designated by the agency (or appropriate legislative body, in the case of local government) as possible bases for the exercise of authority pursuant to this chapter.

RCW 43.21C.060.

With respect to the council's findings relating to adverse impacts, West Main contends the trial court erred in holding that the city council's finding of "significant adverse impacts" was not clearly erroneous. Specifically, West Main contends the decision is invalid because the EIS and FEIS do not support the council's findings and conclusions, and because the adverse impacts found by the council were not specifically identified as "significant" in the environmental impact statements. *See* RCW 43.21C.037. We disagree.

In its findings and conclusions, the city council cited specific policies and provisions and described how West Main's project would be inconsistent with those policies and provi-

sions. The council also cited specific significant adverse impacts supporting its denial of the project.

The first adverse impact identified by the council is the adverse impact on the historic/cultural character of the area called "Old Bellevue". In its finding, the council stated that this impact "could only be avoided or significantly mitigated by greatly reducing the height and intensity of the proposal . . .". This finding is generally supported by the FEIS and the draft environmental impact statement (DEIS) which is incorporated by reference in the FEIS. The FEIS identifies a "Land Use/Aesthetics" impact that would be caused by

> the addition of a high–rise building [Meydenbauer Place] to a neighborhood where most structures are one and two stories tall, and the tallest building is four stories.

Clearly, this specific impact could only be mitigated by redesigning and down–scaling the project.

The second adverse impact identified by the council is the adverse impact on public and private views. The council found that

> [s]uch public and private view impacts, since they are caused by the building's height and bulk in its proposed location, could be avoided or significantly mitigated only by such great reduction in the height and intensity of the project that it would have to be fundamentally rede-signed.

This finding is supported by the FEIS, which identifies the view blockage as an "unavoidable adverse impact."

The third adverse impact identified by the council is shadow impacts. Again, the council found that such impacts could

> be avoided or significantly mitigated only by such great reduction in the height and intensity of the project that it would have to be fundamentally redesigned.

This finding is supported by statements in the DEIS and FEIS to the effect that shadows are an "unavoidable adverse impact".

The fourth adverse impact identified by the council is the

impact on automobile traffic. The council documented the potential traffic impact and then stated that

> [t]he cumulative impacts of other similar projects would further compound already severe traffic problems.
> . . .
> Possible traffic mitigation measures would be unreasonable and unacceptable because they would either similarly worsen traffic conditions elsewhere or drastically alter road/sidewalk configurations or circulation patterns which would sacrifice the area's pedestrian orientation and other qualities essential to its unique character. . . . Even if proposed mitigation measures were adopted, severe traffic problems would persist. For example, the intersection of 103rd and Main would operate at LOS E or worse.

These findings are generally supported by statements in the FEIS and DEIS. Though some mitigation of traffic impacts is possible, the DEIS and FEIS recognize potential cumulative impacts from this and future projects, and the FEIS notes that the fourth possible mitigation measures for alleviating impacts at the intersection of Main/102nd have detrimental side effects.

The fifth adverse impact identified by the council is increased air pollution. The council found that this was an unavoidable adverse impact, and that

> [t]he project is located within a carbon monoxide nonattainment area, abutting a residential area which includes convalescent homes. In this location, the impact is significant. . . .
> There are no feasible means of avoiding or substantially reducing the air pollution consequences of the project short of greatly reducing its intensity . . .

Again, the FEIS listed air pollution as an unavoidable adverse impact. However, the FEIS also states that "traffic volumes would not cause violations of carbon monoxide standards and would not expand the existing non–attainment area." Thus, it does not appear that this impact is significant by itself.

The council concluded that the above mentioned impacts were "significant individually *and collectively* (WAC 197–

11–330(3)(c)), given the location of the proposed project (WAC 197–11–330(3)(a))" (italics ours), and that there were no "reasonable mitigation measures sufficient to mitigate these impacts . . ." After reviewing the record, we are not firmly convinced that a mistake was committed by the council in reaching its decision.

West Main argues, however, that the record does not support the council's findings because the DEIS and FEIS do not specifically label the above mentioned impacts "significant." We disagree.

■ Although the impacts were not labeled "significant" in the EIS, it does not appear from a fair reading of RCW 43.21C.031 and the other relevant statutes that adverse impacts must be specifically labeled "significant" in order for the council to rely on them in making a decision. By definition, an impact statement must be prepared for any project "significantly affecting the quality of the environment". RCW 43.21C.030(2)(c). Moreover, and EIS is required to include only "those probable adverse environmental impacts which are significant." RCW 43.21C.031. WAC 197–11–400(2); WAC 197–11–402(3) ("Discussion of insignificant impacts is not required; if included, such discussion shall be brief and limited to summarizing impacts or noting why more study is not warranted."). Therefore, since the adverse impacts described by the council were identified in the impact statements for the project, and since the council set forth its reasons for concluding that these impacts warranted denial of appellant's application, the council's action complied with the relevant SEPA statutes.

West Main next contends the local SEPA policies cited by the council in support of its decision are not legally valid bases for denying the proposal under SEPA. In its "Conclusions Under SEPA (RCW 43.21C) and the Bellevue SEPA Policies (BCC 22.02.140)", the council concluded that the previously mentioned significant adverse impacts were unacceptable under Bellevue's locally adopted SEPA policies. By and large, the local policies cited by the council

are derived verbatim from either (1) the policies, goals and purposes expressed in the SEPA statutes (RCW 43.21C), (2) the policies, goals and purposes expressed in Bellevue's comprehensive plan, or (3) the policies, goals and purposes expressed in Bellevue's land use code. We will address each of these policy categories separately.

COMPREHENSIVE PLAN AS LOCAL SEPA POLICY

West Main argues that, under RCW 35A.63.080, the City cannot use its comprehensive plan policies, even if such policies are incorporated in local SEPA ordinances, to regulate property rights or land uses. On the other hand respondents argue that SEPA expressly authorizes the designation of local "plans" as SEPA policies.

West Main's argument is based primarily on RCW 35A-.63.080, the Optional Municipal Code, which provides in pertinent part:

From the date of approval by the legislative body the comprehensive plan, its parts and modifications thereof, shall serve as a basic source of reference for future legislative and administrative action: *Provided, That the comprehensive plan shall not be construed as a regulation of property rights or land uses . . .*

(Italics ours.)

West Main reads this statute as prohibiting any regulatory use of a comprehensive plan. However, SEPA allows for the regulatory use of comprehensive plans by requiring that denials of projects be based upon policies identified by the local government "and incorporated into regulations, *plans,* or codes which are formally designated [by the local government] as possible bases" for the exercise of SEPA authority. (Italics ours.) RCW 43.21C.060. Thus, even if RCW 35A.63.080 expresses a general prohibition against regulatory use of comprehensive plans, the Legislature has excepted SEPA ordinances and decisions from that prohibition.

Furthermore, the statutory language at issue—*i.e.,* "the comprehensive plan shall not be construed as a regulation of property rights or land uses"—only speaks to regulatory

use of a comprehensive plan which has not been separately enacted, in whole or in part, as a regulation or ordinance. Therefore, since Bellevue has enacted SEPA ordinances which expressly adopt the comprehensive plan as a local SEPA policy, the council was entitled to rely on the comprehensive plan in denying the proposal under SEPA.

Though appellant also argues that the City cannot, under the guise of SEPA, elevate the comprehensive plan over specific zoning ordinances,[2] this argument overlooks the fact that comprehensive plans and other locally adopted SEPA policies are merely standards or statements of purpose or policy which have regulatory effect *only* when significant adverse environmental impacts render a project unacceptable under those standards or policies. Thus, the SEPA standards or policies are not "elevated" above specific zoning ordinances, but rather they provide general guidance for determining whether the environmental impacts of an otherwise acceptable project require the denial of, or the imposition of conditions on, the project. In this regard, our courts have repeatedly stated that SEPA is not a substitute for local zoning ordinances, but "overlays local ordinances and must be enforced even where a particular use is allowed by local law or policy." *Cook v. Clallam Cy.,* 27 Wn. App. 410, 415, 618 P.2d 1030 (1980), *review denied,* 96 Wn.2d 1008 (1981); *West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 53, 720 P.2d 782 (1986); *Polygon,* at 65; RCW 43.21C.060. SEPA decisions are discretionary and involve the weighing of various environmental policies. *See, e.g., West Main Assocs.,* 106 Wn.2d at 53. *Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980); *Polygon,*

---

[2]All of the cases cited by appellant deal with the question of whether a specific zoning ordinance prevails over a general comprehensive plan where there is a conflict between the two. *See Barrie v. Kitsap Cy.,* 93 Wn.2d 843, 613 P.2d 1148 (1980); *Wildner v. Winslow,* 35 Wn. App. 77, 664 P.2d 1316 (1983); *Carlson v. Beaux Arts Village,* 41 Wn. App. 402, 704 P.2d 663 (1985). None of these cases involved the use of standards in a comprehensive plan where the plan standards have been specifically adopted as a basis for making local SEPA decisions.

at 64–65; *Cook,* at 413. SEPA requires only that governmental bodies evaluate the pertinent environmental policies; it does not require that the result be certain or predictable. *See Noel v. Cole,* 98 Wn.2d 375, 382, 655 P.2d 245 (1982); *Eastlake Comm'ty Coun. v. Roanoke Assocs.,* 82 Wn.2d 475, 497, 513 P.2d 36, 76 A.L.R.3d 360 (1973). Thus, if the standards in a comprehensive plan are adopted locally as SEPA policies or standards, they become enforceable standards for exercising SEPA authority.

This analysis also applies to appellant's contention that the council's action was a denial of its "vested rights." Though a vested right fixes the ordinances with which a building permit and subsequent development must comply, SEPA gives a municipality discretion to deny an application because of adverse environmental impacts even if the project meets all other local requirements. *West Main Assocs.,* 106 Wn.2d at 53.

### LAND USE CODE AS LOCAL SEPA POLICY

West Main's principal argument is that the council's use of the comprehensive plan, under the "guise" of SEPA, to override specific provisions of the land use code, is contrary to statutory and constitutional law. That issue has previously been resolved against West Main. Though West Main also argues that language in the land use code expressing the purpose of the CBD–OB land use district (where the proposed project would be built) cannot be used to override zoning which permits this type of development, our previous analysis regarding the use of general comprehensive plan policies to deny a project that complies with specific zoning requirements applies equally to this argument.

### SEPA POLICIES AND GOALS AS LOCAL SEPA POLICIES

■ West Main contends the council improperly relied on statements of purpose and policy in SEPA statutes in denying its proposal. Specifically, West Main challenges the use of the following statements (adopted locally as SEPA policies) in RCW 43.21C.020(2):

it is the continuing responsibility of . . . all agencies . . .

to . . .
 . . .
 . . . [a]ssure for all people of Washington safe, health-
ful, productive, and esthetically and culturally pleasing
surroundings;
 . . . [and to] [p]reserve important historic, cultural,
and natural aspects of our national heritage;

In support of its argument that the above quoted language
can have no regulatory effect, West Main cites R. Settle,
*Washington Land Use and Environmental Law* § 5.3(a), at
170–71 (1983). However, Professor Settle points out at
pages 170–71 that the policies and goals "of SEPA supple-
ment the existing authority of all government agencies"
(citing RCW 43.21C.060), and that SEPA expressly directs
that the statutory SEPA policies be used as guidelines for
administering all policies, regulations, and laws of the State
of Washington. RCW 43.21C.030(1). Thus, the authority
cited by West Main actually supports the council's action in
this case. Furthermore, the court in *Polygon* held at page
66 that

> SEPA does confer upon the City the authority to apply
> the standards expressed in SEPA to the building permit
> application of a particular property owner.

The court went on to hold that the SEPA standards (the
purposes and policies set out in RCW 43.21C.010 and .020)
are not an unconstitutional delegation of power. *Polygon,* at
66. In these holdings, the court implicitly recognized that
the SEPA statements of purpose and policy may have reg-
ulatory effect to the extent that they provide a valid basis
for declaring environmental impacts unacceptable in a par-
ticular case. Thus, West Main's argument must be rejected
in light of *Polygon* and the SEPA statutes referred to
above.

## CROSS APPEAL

Respondents contend the trial court erred in concluding
that council member Keeffe violated the appearance of
fairness doctrine. They argue that (1) RCW 42.36.020
expressly excludes Mr. Keeffe's conduct from the scope of

the doctrine; and (2) even if RCW 42.36.020 does not control, the conduct at issue (mere presence at a meeting concerning the project) does not amount to a violation of the doctrine under the test articulated by Washington courts.

On the other hand, West Main argues that Keeffe's presence at the project opponents' meeting *did* violate the doctrine. West Main also argues that since the appearance of fairness doctrine prohibits ex parte contacts between public quasi–judicial decision makers and interested parties, *Smith v. Skagit Cy.*, 75 Wn.2d 715, 453 P.2d 832 (1969); RCW 42.36.060, and since council member Keeffe was observed having an ex parte conversation with an opponent of the project, the appearance of fairness doctrine was violated. We disagree.

■ By statute, the doctrine prohibits, with certain exceptions, ex parte communications between public quasi–judicial decision makers and interested parties:

> During the pendency of any quasi–judicial proceeding, no member of a decision–making body may engage in ex parte communications with opponents or proponents with respect to the proposal which is the subject of the proceeding unless that person:
> (1) Places on the record the substance of any written or oral ex parte communications concerning the decision of action; and
> (2) Provides that a public announcement of the content of the communication and of the parties' rights to rebut the substance of the communication shall be made at each hearing where action is considered or taken on the subject to which the communication related. This *prohibition does not preclude a member of a decision–making body from seeking in a public hearing specific information or data from such parties relative to the decision if both the request and the results are a part of the record. Nor does such prohibition preclude correspondence between a citizen and his or her elected official if any such correspondence is made a part of the record when it pertains to the subject matter of a quasi–judicial proceeding.*

RCW 42.36.060. This statute clearly prohibits ex parte communication only if the communication occurs while a

quasi–judicial proceeding is pending. In the instant case, there is no dispute that the communication at issue occurred approximately 1 month prior to the filing of an appeal to the Bellevue City Council. Thus, the communication did not occur during the pendency of any quasi–judicial proceedings. We hold, therefore, that the trial court erred in concluding that council member Keeffe's communication violated the appearance of fairness doctrine.

Affirmed in part, reversed in part.[3]

CALLOW and THIBODEAU, JJ. Pro Tem., concur.

Review by Supreme Court pending June 1, 1988.

---

[3]Respondents also contend the trial court erred in concluding that the criteria for review of the planning director's decision are void and unenforceable. We need not reach this issue because the city council's decision may be upheld on the basis of SEPA. Therefore, we express no opinion as to the validity of Bellevue's administrative design review criteria.