# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MILLENNIUM BULK TERMINALS-LONGVIEW, LLC, and COWLITZ COUNTY<br><br>Respondents,<br><br>and<br><br>BNSF RAILWAY COMPANY,<br><br>Respondent-Intervenor,<br><br>STATE OF WASHINGTON, SHORELINES HEARINGS BOARD, COWLITZ COUNTY HEARINGS EXAMINER,<br><br>Respondents Below,<br>v.<br><br>STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, and WASHINGTON ENVIRONMENTAL COUNCIL, CLIMATE SOLUTIONS, FRIENDS OF THE COLUMBIA GORGE, SIERRA CLUB, and COLUMBIA RIVERKEEPER,<br><br>Petitioners. | No. 52215-2-II<br><br><br><br><br><br><br><br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — Millennium Bulk Terminals-Longview (Millennium) sought to build the largest coal export terminal in North America, to be located in Longview. Millennium planned to build the facility in two stages, Stage 1 and Stage 2. An environmental impact statement (EIS) under the State Environmental Policy Act (SEPA), chapter 43.21C RCW, analyzed the impacts of the facility based on the completion of Stage 2. As necessary for the project, Millennium applied

to Cowlitz County for a substantial development permit and a conditional use permit. The permit application only sought permits necessary to build Stage 1 of the project.

The County recommended approval of the permit application. However, after a hearing, the Cowlitz County Hearing Examiner denied Millennium's permit application. Millennium and the County then petitioned the Shorelines Hearings Board (the Board) for review of the Hearing Examiner's decision. The Department of Ecology (DOE) and numerous environmental groups[1] (collectively, WEC) intervened as respondents. BNSF Railway Company (BNSF) intervened as a petitioner.

Before conducting a hearing, the Board granted DOE's and WEC's motions for summary judgment. The Board's ruling affirmed the Hearing Examiner's denial of Millennium's permit application based on the Hearing Examiner's exercise of SEPA substantive authority. Millennium then sought judicial review of the Board's decision, and we accepted direct review.

Millennium[2] argues that the Board erred when it limited the scope of its review to the record created before the Hearing Examiner, an error which was compounded by the fact that the Board never obtained the full record before the Hearing Examiner and then did in fact accept extra-record evidence from DOE. Millennium next contends that the Board erred when it concluded that the Hearing Examiner properly considered impacts from the whole project, when it only sought permits for Stage 1. Similarly, Millennium argues that the Board erred when it concluded that the Hearing Examiner took due account of the impacts and mitigation related to Stage 1.

---

[1] Washington Environmental Council (WEC), Climate Solutions, Friends of the Columbia Gorge, Sierra Club, and Columbia Riverkeeper.

[2] We often refer to Millennium and BNSF collectively as Millennium. In addition, we refer to DOE and WEC collectively as DOE.

Finally, Millennium contends that the Board erred in affirming the Hearing Examiner's exercise of SEPA substantive authority to deny its permit application.

We affirm the Board's decision.

FACTS

I.    ENVIRONMENTAL IMPACT STATEMENT

Millennium sought to build a coal export terminal in Longview, which would receive coal by train from various states. The trains would then be unloaded, stockpiled, and loaded by conveyors to ships which would transport the coal to Asia.

Because significant adverse impacts on the environment would likely result from the facility, SEPA required the preparation of an EIS. Cowlitz County and DOE served as co-lead agencies responsible for the EIS.

The EIS recognized that Millennium would construct the facility in two stages. At the completion of Stage 1, the terminal would have an annual throughput capacity of approximately 25 million metric tons of coal per year. At the completion of Stage 2, often termed "full build-out," the terminal would receive and send out approximately eight trains per day, load approximately 70 ships per month, and "have a maximum annual throughput capacity of up to 44 million metric tons of coal per year." Admin. Record (AR) at 511, 515.

The EIS analyzed the significant adverse impacts and proposed mitigation measures based on the facility at full build-out. The EIS discussed how

> [i]f the proposed mitigation measures [identified in the EIS] were implemented, they would reduce but not completely eliminate significant adverse environmental impacts resulting from construction and operation of the [facility]. Unavoidable and significant adverse environmental impacts could remain for nine environmental resource areas: social and community resources; cultural resources; tribal resources; rail transportation; rail safety; vehicle transportation; vessel transportation; noise and vibration; and air quality.

3

AR at 518. The EIS then analyzed those nine impact areas, and potential mitigations measures, in greater detail.

The EIS also contained a lifecycle assessment of estimated net greenhouse gas (GHG) emissions. While the EIS did not list GHG emissions among the project's significant adverse impacts, it assumed that Millennium would offset 100 percent of GHG emissions. Thus, the EIS determined that "[w]ith implementation of proposed mitigation, there would be no unavoidable and significant adverse environmental impacts from [GHG] emissions." AR at 981.

## II. SHORELINE PERMITS

In 2016, Millennium applied to Cowlitz County for a substantial development permit and a conditional use permit as required under the Shoreline Management Act of 1971 (SMA). In its permit application, Millennium noted that it would construct the facility in two stages, which would require separate permit applications.

Millennium's permit application only sought permits for Stage 1. Stage 1 consisted of the construction of two docks, one shiploader, conveyors, two stockpile pads, train unloading facilities, one rail track, and up to eight rail storage tracks. Stage 1 also included substantial dredging of the Columbia River. At the completion of Stage 1, the facility would have the capacity to ship 25 million metric tons of coal per year.

Stage 2 included the construction of an additional shiploader, two stockpile pads, and conveyors. At the completion of Stage 2, the facility would have the capacity to ship 44 million metric tons of coal per year.

The County issued a staff report recommending approval of Millennium's permit application with 36 conditions. The staff report recognized that Millennium's permit application only sought a permit for Stage 1 and that Millennium would have to submit a second permit

application prior to any construction related to Stage 2. The staff report noted that "construction of Stage 2 would occur beginning at the completion of Stage 1." AR at 710. Although the staff report recognized that Millennium only sought permits for Stage 1, it analyzed the project's impacts at full build-out.

As required under Cowlitz County Code 19.20.050(A)(1), the staff report and Millennium's permit application were transmitted to the Cowlitz County Hearing Examiner for review.

III.    HEARING EXAMINER

The Hearing Examiner held a three-day hearing.[3] The County, Millennium, WEC, and other interested parties participated in the hearing; DOE did not. The parties submitted prehearing memoranda and exhibits, and presented testimony and argument. Near the outset of the hearing, Millennium confirmed that its permit application covered only Stage 1.

During the hearing, the Hearing Examiner gave Millennium and the County "the opportunity to propose reasonable mitigation" in addition to the mitigation measures discussed in the EIS. AR at 10. Millennium submitted an exhibit that summarized questions the Hearing Examiner posed. It largely related to mitigation measures and responded to the Hearing Examiner's questions on that subject.

It appears the Hearing Examiner thought that a great deal of Millennium's expert evidence conflicted with the EIS. The Hearing Examiner stated:

> [Millennium] has presented the testimony of several experts whose opinions are in conflict with the []EIS but, in the absence of any appeal [of the EIS], this testimony is largely irrelevant to the issue of whether the ten unavoidable, significant adverse environmental impacts identified in the []EIS can be reasonably mitigated.

---

[3] The record before us does not contain the transcript of the entire proceedings before the Hearing Examiner. There are only excerpts.

The conditions proposed in the Staff Report do not reasonably mitigate these impacts. At the conclusion of the hearing the County chose not to propose any new conditions, and [Millennium's] position is nearly identical to the County's. As a result, neither the County nor [Millennium] propose reasonable mitigation for any of the unavoidable, significant adverse environmental impacts identified in the []EIS.

AR at 56-57.

The Hearing Examiner's ruling documented findings related to SEPA. The ruling discussed the EIS's findings regarding adverse impacts, and the Hearing Examiner found that the project would result in adverse impacts. Regarding GHGs, the Hearing Examiner recognized that the EIS operated on the assumption that Millennium would mitigate 100 percent of the GHG emissions associated with the project. During the hearing, however, Millennium stated that it would not mitigate 100 percent of the GHG emissions but would instead only mitigate about 0.5 percent of the GHG emissions. Thus, although the EIS only identified nine significant adverse impacts, the Hearing Examiner found, with the addition of GHG emissions, that the project had 10 significant adverse impacts associated with it.

The Hearing Examiner's ruling then summarized Millennium's proposed mitigation:

- The parties' proposed mitigation for noise impacts is insufficient to ensure that Quiet Zones will be implemented.
- The parties do not propose any mitigation for the increased risk of cancer. Their only suggestion is that eventually the BNSF will upgrade to Tier 4 status, but currently only 6% of the BNSF fleet meets this standard. The remainder of the fleet will not be completely upgraded for more than 20 years.
- The parties' proposed conditions to mitigate traffic impacts do not ensure that the necessary track improvements will be made . . . .
- The parties do not propose any conditions addressing the impacts to the Reynolds Historic District.
- The parties' proposed conditions fail to ensure rail capacity or rail safety.
- The parties do not propose any conditions to ensure vessel safety and appropriate responsibility for any vessel accident.

6

- The Mitigation Plan . . . will address some tribal concerns but not all of them. The parties do not propose any additional conditions to address additional tribal impacts.
- The County proposes no [GHG] mitigation, while [Millennium] proposes less than 1% of that required under the EIS.

AR at 57-58.

The ruling also identified local SEPA policies adopted in the Cowlitz County Code and discussed how the project's failure to mitigate the significant adverse impacts "conflicts with virtually every one of the County's environmental policies." AR at 59. Accordingly, the Hearing Examiner exercised SEPA substantive authority and denied Millennium's permit application.

The Hearing Examiner also denied Millennium's permit application on the basis that Millennium failed to satisfy the requirements of the SMA and the Cowlitz County Shoreline Management Plan.

The Hearing Examiner's decision listed the evidence that had been submitted to it.

IV.    SHORELINES HEARINGS BOARD

Millennium and Cowlitz County each filed petitions with the Board requesting review of the Hearing Examiner's decision. The Board consolidated them. DOE, WEC, and BNSF intervened. The Board scheduled a hearing in March 2018 and ordered that discovery be completed by February 2018.

The parties agreed that the appeal presented nine legal issues. The issues relevant to the Hearing Examiner's exercise of SEPA substantive authority included:

2.    Did the Cowlitz Hearing Examiner misinterpret, misapply or fail to apply the [SEPA] or County SEPA regulations and other regulations?
3.    Did the Cowlitz Hearing Examiner fail to analyze the Project as presented in the applications and in light of substantial evidence and the County SMP?
. . . .

7

8.  Whether Millennium and Cowlitz County are barred from challenging the [EIS's] findings and conclusions regarding the ten areas of significant, adverse, unmitigated impacts cited in the Hearing Examiner decision?

9.  Did the Hearing Examiner lawfully exercise substantive authority under the SEPA . . . to deny the shoreline permit?

AR at 426-27.

Various parties then moved for summary judgment on some or all issues. DOE and WEC moved for summary judgment on all issues. In its reply brief in support of its motion, DOE offered a portion of a draft EIS prepared by the United States Army Corps of Engineers under the National Environmental Policy Act.[4]

The Board granted DOE's and WEC's motions and denied all the other summary judgment motions. Because the Board affirmed the Hearing Examiner's exercise of SEPA substantive authority to deny Millennium's permit application, it ruled that it did not need to reach the remaining legal issues.

In the background section of its order, the Board cited to the United States Army Corps of Engineers' draft EIS for the proposition that "in order for a coal export terminal to be economically viable, [Millennium] needed [to have] a throughput capacity of 40 to 50 [million metric tons of coal per year]." AR at 2064.

The Board concluded that it was bound to the record created before the Hearing Examiner. The Board stated:

> To properly employ the clearly erroneous standard of review to the exercise of SEPA substantive authority, where there has been an open record hearing below and there is an unchallenged []EIS which identifies significant adverse unmitigated environmental impacts, the Board concludes that the appropriate scope of review is limited to the record created during that hearing.

---

[4] It appears that the portion of the draft EIS had not been submitted to the Hearing Examiner.

AR at 2073-74.

Millennium and Cowlitz County petitioned the superior court for review of the Board's decision. The court consolidated the petitions. DOE then petitioned for direct review, which we granted.

ANALYSIS

I.    MOOTNESS

We ordered the parties to provide supplemental briefing on whether our decision in *Northwest Alloys, Inc. v. Department of Natural Resources*, 10 Wn. App. 2d 169, 447 P.3d 620 (2019), *review denied*, 194 Wn.2d 1019 (2020), renders the current appeal moot.

Millennium argues that the appeal is not moot because the shoreline permits at issue in this case do not depend on it obtaining permission to sublease aquatic lands from the Department of Natural Resources, which was at issue in *Northwest Alloys*. We agree.

"A case is moot if a court can no longer provide effective relief." *SEIU Healthcare 775NW v. Gregoire*, 168 Wn.2d 593, 602, 229 P.3d 774 (2010). "When an appeal is moot, it should be dismissed." *Klickitat County Citizens Against Imported Waste v. Klickitat County*, 122 Wn.2d 619, 631, 860 P.2d 390, 866 P.2d 1256 (1994). "'The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.'" *City of Sequim v. Malkasian*, 157 Wn.2d 251, 259, 138 P.3d 943 (2006) (quoting 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3533.3, at 261 (2d ed. 1984)). "'As long as the

parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'" *Chafin v. Chafin*, 568 U.S. 165, 172, 133 S. Ct. 1017, 185 L. Ed. 2d 1 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307-08, 132 S. Ct. 2277, 183 L. Ed. 2d 281 (2012)).

Millennium's permit application does not rely on it being the sublessee of the aquatic lands at issue *Northwest Alloys*. Therefore, if we reversed and remanded to the Board, and the Board subsequently granted Millennium's permit application, then Millennium could obtain meaningful relief. Millennium could obtain the shoreline permits for which it applied. Accordingly, we conclude that this case is not moot.

II.    LEGAL PRINCIPLES

A.    Standards of Review

The parties agree that the Board reviews an administrative body's exercise of SEPA substantive authority to deny a shoreline permit application under the "clearly erroneous" standard. *Cougar Mountain Assocs. v. King County*, 111 Wn.2d 742, 747, 765 P.2d 264 (1988); *Citizens for Sensible Growth v. City of Leavenworth*, No. 98-24 (Wash. Shorelines Hr'gs Bd. Oct. 15, 1998). "Under the clearly erroneous standard of review, the [Board] 'does not substitute its judgment for that of the administrative body and may find the decision clearly erroneous only when it is left with the definite and firm conviction that a mistake has been committed.'" *Cougar Mountain Assocs.*, 111 Wn.2d at 747 (internal quotation marks omitted) (quoting *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 69, 578 P.2d 1309 (1978)).

We review orders from the Board under the Washington Administrative Procedure Act (APA). RCW 34.05.518; *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 789-90, 51 P.3d 744 (2002). Judicial review is limited to the record before the Board.

RCW 34.05.558. Under the APA, we may grant relief from the Board's ruling if we determine, among other issues, that the ruling is based on an erroneous interpretation or application of the law or is arbitrary and capricious. RCW 34.05.570(3).

However, when an agency's ruling is made on summary judgment, we review those decisions de novo, making the same inquiry as the Board. *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 585, 344 P.3d 199 (2015). At summary judgment, we "must view the facts and reasonable inferences in the light most favorable to the non-moving party." *Eastlake Cmty. Council v. City of Seattle*, 64 Wn. App. 273, 276, 823 P.2d 1132 (1992). "Summary judgment is proper when the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012). If no material facts are in dispute, and if the Board properly granted summary judgment, the Board's ruling could not be clearly erroneous.

B.      The SMA and SEPA

With some exceptions, none of which is applicable here, the SMA applies to the "shorelines" of the state. RCW 90.58.030(2)(e), .140. The SMA requires local governments to develop and enforce a shoreline management plan (SMP). RCW 90.58.080. An SMP is a comprehensive use plan, "constitut[ing] use regulations for the various shorelines of the state." RCW 90.58.100(1). Development on shorelines must be consistent with the policies and purpose of the SMA as adopted in the applicable SMP or they "shall not be undertaken." RCW 90.58.140(1). "[S]ubstantial development shall not be undertaken on shorelines of the state without first obtaining a permit." RCW 90.58.140(2). The SMA and Cowlitz County Code authorize the County to issue or deny substantial development permits and conditional use permits. RCW 90.58.050, .140; chapter 19.20 CCC.

SEPA requires an EIS on "proposals for . . . major actions having a probable significant, adverse environmental impact." RCW 43.21C.031(1); *see* WAC 197-11-330. "The primary function of an EIS is to identify adverse impacts to enable the decisionmaker to ascertain whether they require either mitigation or denial of the proposal." *Victoria Tower P'ship v. City of Seattle*, 59 Wn. App. 592, 601, 800 P.2d 380 (1990). "SEPA requires only that governmental bodies evaluate the pertinent environmental policies; it does not require that the result be certain or predictable." *W. Main Assocs. v. City of Bellevue*, 49 Wn. App. 513, 526, 742 P.2d 1266 (1987).

Proposed land use actions with significant environmental impacts are "subject to review for both substantive and procedural compliance with SEPA." *Kiewit Constr. Grp., Inc. v. Clark County*, 83 Wn. App. 133, 138-39, 920 P.2d 1207 (1996). "Substantive review considers the merits of the proposal, while procedural review involves the EIS process, including the adequacy of the EIS." *Kiewit Const. Grp.*, 83 Wn. App. at 139. "EIS adequacy refers to the legal sufficiency of the environmental data contained in the impact statement." *Klickitat County Citizens Against Imported Waste*, 122 Wn.2d at 633. "Whether an EIS is adequate is a question of law."[5] *Klickitat County Citizens Against Imported Waste*, 122 Wn.2d at 632.

SEPA's substantive authority allows decision-makers to condition or deny government action based on an EIS, assuming certain conditions are satisfied. RCW 43.21C.060; *Polygon Corp.*, 90 Wn.2d at 64 ("SEPA confers substantive authority to the deciding agency to act on the basis of the impacts disclosed."). SEPA substantive authority is "not a substitute for local zoning ordinances, but 'overlays local ordinances and must be enforced even where a particular use is allowed by local law or policy.'" *W. Main Assocs.*, 49 Wn. App. at 525 (quoting *Cook v. Clallam County*, 27 Wn. App. 410, 415, 618 P.2d 1030 (1980)). Thus, SEPA's substantive authority allows

---

[5] Here, no party challenged the adequacy of the EIS.

a decision-maker to deny a project "because of adverse environmental impacts even if the application meets all other requirements and conditions for issuance." *W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 53, 720 P.2d 782 (1986), *abrogated on other grounds by Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019).

In order to deny a proposal through SEPA substantive authority, a decision-maker must (1) find that the proposal would result in significant adverse impacts identified in the relevant environmental document, (2) find that reasonable mitigation measures are insufficient to mitigate the identified impacts, and (3) cite the relevant agency SEPA policy that is the basis for its denial and discuss why the project is inconsistent with that policy.[6]  RCW 43.21C.060; WAC 197-11-660(1)(a)-(b), (f).

"Piecemealing is the practice of conducting environmental review only on current segments of public works projects and postponing environmental review of later segments until construction begins." *Concerned Taxpayers Opposed to the Modified Mid-South Sequim Bypass v. Dep't of Transp.*, 90 Wn. App. 225, 231 n.2, 951 P.2d 812 (1998).

SEPA regulations disallow piecemeal environmental review, requiring that parts of proposals which "are related to each other closely enough to be, in effect, a single course of action shall be evaluated in the same environmental document." WAC 197-11-060(3)(b).  Piecemealing "is disfavored because the later environmental review often seems merely a formality, as the construction of the later segments of the project has already been mandated by the earlier construction." *Concerned Taxpayers*, 90 Wn. App. at 231 n.2.

---

[6] Cowlitz County Code contained appropriate SEPA policies on which the Hearing Examiner based its decision.  Former CCC 19.11.110(B) (2017).  Because Millennium does not challenge this aspect of the Hearing Examiner's decision to exercise SEPA substantive authority, those policies and the Hearing Examiner's examination of them are not discussed in detail.

The SMA also disallows piecemeal environmental review. The SMA seeks "to prevent the inherent harm in an uncoordinated and piecemeal development of the state's shorelines." RCW 90.58.020. Piecemeal development creates the danger that the review and public scrutiny of connected developments will be diluted and less effective in "protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life." RCW 90.58.020; *see Jarvis v. Kitsap County*, No. 08-001, at 11 (Wash. Shorelines Hr'gs Bd. Apr. 8, 2008).

Whether a contemplated development is being presented for review in an impermissible piecemeal fashion depends on the particular facts presented. For purposes of SEPA and SMA review, the Board's test for impermissible piecemealing, is whether "a proposal is really a single project that has been divided into segments that are interrelated and interdependent." *Jarvis*, No. 08-001, at 11 (citing *Merkel v. Port of Brownsville*, 8 Wn. App. 844, 847, 509 P.2d 390 (1973)).

III.     EXERCISE OF SEPA SUBSTANTIVE AUTHORITY

A.     No Genuine Issues of Material Fact Exist

Millennium argues that genuine issues of material fact remain regarding "whether Stage 1 improvements would result in significant adverse environmental impacts identified in the EIS" and whether mitigation measures would offset those impacts. Br. of Millennium at 48.

We disagree because Millennium's argument largely relies on piecemealing Stage 1 impacts from Stage 2 impacts. *E.g.*, Br. of Millennium at 48 ("[Millennium] cited to evidence that the impacts identified in the EIS would not result from the construction of Stage 1 alone."). Millennium's attempt to piecemeal the project is addressed and rejected below.

14

As discussed above, in order to deny Millennium's proposal via SEPA substantive authority, the Hearing Examiner was required to: (1) find that Millennium's proposal would result in significant adverse impacts identified in the EIS, (2) find that reasonable mitigation measures were insufficient to mitigate the identified impacts, and (3) cite the Cowlitz County SEPA policy that was the basis for its denial and discuss why Millennium's project was inconsistent with that policy. RCW 43.21C.060; WAC 197-11-660(1)(a)-(b), (f). The Board then reviewed the Hearing Examiner's decision to determine whether that decision was "clearly erroneous." *Cougar Mountain Assocs.*, 111 Wn.2d at 747; *Citizens for Sensible Growth*, No. 98-24.

Millennium presented evidence that impacts from Stage 1 would not result in the adverse impacts identified in the EIS. Millennium also presented evidence regarding whether its proposed measures would mitigate the identified impacts. DOE does not dispute any of Millennium's proffered evidence. Rather, the parties simply dispute the conclusions that can be drawn from such undisputed evidence. Therefore, the Board did not err in concluding that no genuine issues of material fact exist.

Finally, although Millennium contends that genuine issues of material fact exist because it intended to present extra-record evidence regarding the effects of mitigation at the hearing before the Board, it failed to state what evidence it intended to present and never made an offer of proof. Thus, we reject Millennium's bald assertion that genuine issues of material fact exist simply because of evidence it intended to present but never did.

B.      The Board Properly Applied the Law

1.      Viewing Stage 2 Impacts

Millennium argues that the Board erred when it concluded that "the Hearing Examiner's 'consideration of the Project as a whole was not clearly erroneous.'" Br. of Millennium at 32

15

(quoting AR at 2079). Millennium contends that "[i]t is self-evident that a government body reviewing an application for a shoreline permit under the SMA must base its decision on the proposal described in the application before it." Br. of Millennium at 32-33. Because Millennium's argument is based on an impermissible attempt to piecemeal its project under the SMA, we disagree.

The record shows that Stage 1 and Stage 2 are interrelated and interdependent. *Jarvis*, No. 08-001, at 11. Without objection, Millennium obtained an EIS analyzing the impacts from the coal export facility at full build-out. Thus, it did not impermissibly piecemeal in the preparation of the EIS. It also did not appeal the adequacy of that EIS.

However, regarding the shoreline permits under the SMA, the staff report analyzed Millennium's entire project for compliance with the County SMP. And only after the Hearing Examiner denied its permit application did Millennium contend that analyzing Stage 2 impacts to deny its permit application for Stage 1 was impermissible.

We reject Millennium's attempt to unlawfully piecemeal its project to avoid review under the SMA and SEPA substantive authority. Accepting Millennium's argument that the Hearing Examiner could not consider Stage 2 impacts would effectively allow Millennium to nullify SEPA substantive authority as applied to its project through the SMA. As noted above, SEPA substantive authority overlays local government policies; here, the SMA through the Cowlitz County Code. Accepting Millennium's argument would dilute the SMA review process and public scrutiny of Millennium's Stage 1 permit application, in contravention of the purposes that the SMA seeks to achieve. RCW 90.58.020. In addition, it would permit a collateral attack on the EIS.

Completion of Stage 1 would then have a coercive effect on the completion of Stage 2. Stage 1 involves the construction of a large coal export terminal, and Stage 2 involves far less construction but allows the terminal to vastly increase the amount of coal it processes. This is precisely the type of piecemealing that the legislature was concerned about. RCW 90.58.020; *Concerned Taxpayers*, 90 Wn. App. at 231 n.2; *see also Merkel*, 8 Wn. App. at 850-51.

2.      Alleged Refusal to Consider Stage 1 Evidence

Millennium argues that the Board erred when it said that the Hearing Examiner looked at Stage 1 impacts and mitigation but simply gave them little weight. According to Millennium, the Hearing Examiner did not consider its evidence because it wrongly concluded that it could not consider its evidence. We disagree.

An EIS "shall be used by agency officials in conjunction with other relevant materials and considerations to plan actions and make decisions." WAC 197-11-400(4).

In its ruling, the Hearing Examiner stated:

[Millennium] has presented the testimony of several experts whose opinions are in conflict with the []EIS but, in the absence of any appeal, this testimony is *largely irrelevant* to the issue of whether the ten unavoidable, significant adverse environmental impacts identified in the []EIS can be reasonably mitigated.

AR at 56 (emphasis added).

Millennium's reliance on the Hearing Examiner's use of the phrase "largely irrelevant" is misplaced. Millennium argues that the Hearing Examiner did not consider any of its evidence because it termed that evidence "largely irrelevant." However, a swath of evidence can be "largely irrelevant" even if individual pieces of evidence are relevant.

Millennium's true argument seems to dispute the characterization of its evidence. The record shows that the Hearing Examiner heard three days of testimony where Millennium presented expert witnesses and exhibits, and was afforded the opportunity to propose reasonable

17

mitigation measures. Additionally, Millennium submitted an exhibit that summarized questions the Hearing Examiner posed and its responses, largely related to mitigation measures. Thus, Millennium has not shown that the Hearing Examiner precluded it from presenting any evidence or that the Hearing Examiner viewed as irrelevant any reasonable mitigation measures presented by Millennium. Accordingly, we reject Millennium's argument.[7]

         3.      The Exercise of SEPA Substantive Authority Was Not Clearly Erroneous

Millennium argues that the Hearing Examiner's denial of its permit application under SEPA substantive authority was clearly erroneous. Millennium contends that the Hearing Examiner failed to make the specific findings as to both significant adverse impacts and mitigation. We disagree.

As noted above, in order to deny Millennium's proposal under SEPA substantive authority, the Hearing Examiner had to find that "(1) The proposal would result in significant adverse impacts identified in a final or supplemental [EIS] . . . (2) reasonable mitigation measures [were] insufficient to mitigate the identified impact," and (3) cite the SEPA policy contained in the Cowlitz County Code that was the basis for its denial and discuss why the project was inconsistent with that policy. RCW 43.21C.060; WAC 197-11-660(1)(a)-(b), (f).

___

[7] For similar reasons, we reject Millennium's argument that the Board erred in granting DOE summary judgment on issue 8. According to Millennium, the Board agreed with it on the law but "inexplicably granted [DOE's] and WEC's Motions for Summary Judgment on Issue 8." Br. of Pet. Millennium at 50. However, Millennium's challenge is simply another way for it to argue about the characterization of its evidence. Millennium agrees that the Board's order correctly stated the law. Millennium therefore agrees that it cannot challenge the EIS's determination of environmental impacts or their significance but can challenge the Hearing Examiner's use of the EIS in its exercise of SEPA substantive authority. Thus, Millennium's true argument is that the evidence it provided fell in the latter category and was permissible evidence that the Hearing Examiner erroneously disregarded. For these reasons, we reject Millennium's argument.

Regarding impacts, the EIS determined that even if Millennium implemented the identified mitigation measures, "[u]navoidable and significant adverse environmental impacts could remain for nine environmental resource areas." AR at 518. After a three-day hearing, the Hearing Examiner found that, based on the EIS and the evidence presented at the hearing, ten significant adverse impacts would result from Millennium's proposed terminal.

The EIS contained a lifecycle assessment of estimated net GHG emissions. Although the EIS determined that GHG emissions would not be a significant adverse impact, it reached that determination on the assumption that Millennium would offset 100 percent of GHG emissions. However, at the hearing, Millennium clarified its position that it would only offset 0.5 percent of the GHGs. As a result, the Hearing Examiner found that GHG emissions constituted a tenth significant adverse impact.

The Hearing Examiner's finding regarding GHG emissions was not clearly erroneous. Impacts need not be "labeled 'significant' in order for [an agency] to rely on them in making a decision." *W. Main Assocs.*, 49 Wn. App. at 523. Instead, the EIS must simply identify the impacts, and the agency must "set forth its reasons for concluding that these impacts warrant[] denial of the . . . application." *W. Main Assocs.*, 49 Wn. App. at 523. Here, the EIS identified impacts from GHG emissions, and the Hearing Examiner set forth reasons why GHG emissions constituted a tenth significant adverse impact.

Because the EIS identified significant adverse impacts, and the Hearing Examiner relied on those impacts, we agree with the Board that the Hearing Examiner complied with the first prong of SEPA substantive authority.

Regarding mitigation, the Hearing Examiner discussed in detail proposed mitigation measures and discussed why the proposed mitigation measures were insufficient to mitigate the impacts. The Hearing Examiner specifically listed the deficiencies in the proposed mitigation. For example, the Hearing Examiner stated that "[t]he parties' proposed mitigation for noise impacts is insufficient to ensure that Quiet Zones will be implemented." AR at 57.

As a result, the Hearing Examiner concluded that "neither the County nor [Millennium] propose reasonable mitigation for any of the unavoidable, significant adverse environmental impacts identified in the []EIS." AR at 57. Therefore, we agree with the Board that the Hearing Examiner complied with the second prong of SEPA substantive authority.

Finally, the Hearing Examiner cited SEPA policies contained in the Cowlitz County Code and discussed how the impacts from the project conflicted with "virtually every one of [those] policies." AR at 59. We agree with the Board that the Hearing Examiner complied with the third prong of SEPA substantive authority.

Based on all of the above, we agree with the Board that the Hearing Examiner's exercise of SEPA substantive authority was not clearly erroneous.

IV.    OTHER ALLEGED ERRORS

Millennium argues that the Board committed numerous other errors. It contends that the Board impermissibly limited the scope of its review to the record before the Hearing Examiner, limited its review yet never obtained a copy of that record, and failed to comply with its own ruling because it accepted new evidence from DOE. We reject Millennium's arguments.

If no genuine issues of material fact exist, the Board may employ the summary judgment procedure. *Eastlake Cmty. Council*, 64 Wn. App. at 276. No party argues that the Board cannot grant summary judgment. Here, the Board set an adjudicatory hearing where it would have heard

20

evidence; however, before conducting the hearing, the Board ruled on summary judgment. We look to the record before the Board. RCW 34.05.558.

First, Millennium did not submit other materials beyond the record before the Hearing Examiner to the Board, but it could have. With its summary judgment motion, Millennium could have presented any admissible evidence it chose. Millennium has not shown that it submitted any evidence that the Board rejected. Therefore, Millennium's argument that the Board erred by not hearing evidence beyond that provided to the Hearing Examiner is without merit. Millennium chose what materials it submitted to the Board.[8]

Second, Millennium could have submitted to the Board the entire Hearing Examiner record. Millennium chose not to. We conclude that the Board's decision, granting summary judgment in favor of DOE based on the portions of the record that the parties submitted during summary judgment, was neither an erroneous interpretation or application of the law nor was it arbitrary and capricious. RCW 34.05.570(3).

Finally, we reject Millennium's argument that it failed to abide by its own ruling. We recognize that in DOE's reply brief in support of its motion for summary judgment before the Board, the agency offered evidence not presented to the Hearing Examiner. We also recognize that the Board's decision cited that document. However, at summary judgment, DOE was free to submit any evidence it chose to support its motion. If Millennium opposed that evidence, it should have objected to it or moved to strike it. Millennium chose not to do so.

---

[8] If this matter had proceeded to a hearing and not been decided on summary judgment, then Millennium's argument that it had been precluded from presenting additional evidence may have more merit.

We affirm the Board's decision.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Sutton, J.